The PEOPLE of the State of
Colorado, Petitioner,

v.

Nathan HALL, Respondent.

No. 99SC105.

Supreme Court of Colorado,
En Banc.

April 10, 2000.

208

F. Michael Goodbee, District Attorney, Fifth Judicial District, Robert H. Wheeler, Deputy District Attorney, Eagle, Attorneys for Petitioner.

Heckman & O'Connor, P.C., Brett Steven Heckman, Edwards, Attorneys for Respondent.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

We hold that Nathan Hall must stand trial for the crime of reckless manslaughter. While skiing on Vail mountain, Hall flew off of a knoll and collided with Allen Cobb, who was traversing the slope below Hall. Cobb sustained traumatic brain injuries and died as a result of the collision. The People charged Hall with felony reckless manslaughter.

At a preliminary hearing to determine whether there was probable cause for the felony count, the county court found that Hall's conduct "did not rise to the level of dangerousness" required under Colorado law to uphold a conviction for manslaughter, and

the court dismissed the charges. On appeal, the district court affirmed the county court's decision. The district court determined that in order for Hall's conduct to have been reckless, it must have been "at least more likely than not" that death would result. Because the court found that "skiing too fast for the conditions" is not "likely" to cause another person's death, the court concluded that Hall's conduct did not constitute a "substantial and unjustifiable" risk of death. Thus, the district court affirmed the finding of no probable cause.

The charge of reckless manslaughter requires that a person "recklessly cause[ ] the death of another person." § 18–3–104(1)(a), 6 C.R.S. (1999). For his conduct to be reckless, the actor must have consciously disregarded a substantial and unjustifiable risk that death could result from his actions. See § 18–1–501(8). We hold that, for the purpose of determining whether a person acted recklessly, a particular result does not have to be more likely than not to occur for the risk to be substantial and unjustifiable. A risk must be assessed by reviewing the particular facts of the individual case and weighing the likelihood of harm and the degree of harm that would result if it occurs. Whether an actor consciously disregarded such a risk may be inferred from circumstances such as the actor's knowledge and experience, or from what a similarly situated reasonable person would have understood about the risk under the particular circumstances.

We hold that under the particular circumstances of this case, whether Hall committed the crime of reckless manslaughter must be determined by the trier of fact. Viewed in the light most favorable to the prosecution, Hall's conduct—skiing straight down a steep and bumpy slope, back on his skis, arms out to his sides, off-balance, being thrown from mogul to mogul, out of control for a considerable distance and period of time, and at such a high speed that the force of the impact between his ski and the victim's head fractured the thickest part of the victim's skull—created a substantial and unjustifiable risk of death to another person. A reasonable person could infer that the defendant, a former ski racer trained in skier safety, consciously disregarded that risk. For the limited purposes of a preliminary hearing, the prosecution provided sufficient evidence to show probable cause that the defendant recklessly caused the victim's death. Thus, we reverse the district court's finding of no probable cause and we remand the case to that court for trial.

## II. FACTS AND PROCEDURAL HISTORY

On April 20, 1997, the last day of the ski season, Hall worked as a ski lift operator on Vail mountain. When he finished his shift and after the lifts closed, Hall skied down toward the base of the mountain. The slopes were not crowded.

On the lower part of a run called "Riva Ridge," just below where the trail intersects with another called "North Face Catwalk," Hall was skiing very fast, ski tips in the air, his weight back on his skis, with his arms out to his sides to maintain balance. He flew off of a knoll and saw people below him, but he was unable to stop or gain control because of the moguls.

Hall then collided with Cobb, who had been traversing the slope below Hall. The collision caused major head and brain injuries to Cobb, killing him. Cobb was taken to Vail Valley Medical Center, where efforts to resuscitate him failed. Hall's blood alcohol level was .009, which is less than the limit for driving while ability impaired. A test of Hall's blood for illegal drugs was negative.

The People charged Hall with manslaughter (a class 4 felony)[1] and misdemeanor charges that are not relevant to this appeal. At the close of the prosecution's case at the preliminary hearing, the People requested that, with respect to the manslaughter count, the court consider the lesser-included charge of criminally negligent homicide (a class 5 felony).[2]

The county court held a preliminary hearing to determine whether there was probable

1. See § 18–3–104(1)(a).

2. See § 18–3–105.

cause to support the felony charges against Hall. At the preliminary hearing, the People presented testimony from an eyewitness, the coroner who conducted the autopsy on Cobb's body, an investigator from the District Attorney's office, and the detective who investigated the accident for the Eagle County Sheriff's department.

Judge Buck Allen, who serves as a judge for several mountain towns and lives in Vail, testified that he is an expert skier and familiar with Vail's slopes. He was making a final run for the day when he first noticed Hall on the slope. Allen was on part of the run called "Lower Riva," which is just below the "North Face Catwalk." From that part of the slope, Allen had a direct line of sight to the bottom of the run. Allen said that he could see other skiers traversing the slope below him at least from their waists up and that there were no blind spots on that part of the run.

Hall passed Allen skiing "at a fairly high rate of speed." Allen estimated that Hall was skiing about three times as fast as he was. Allen stated that Hall was "sitting back" on his skis, tips in the air, with his arms out to his sides in an effort to maintain his balance. Hall was skiing straight down the fall line; that is, he was skiing straight down the slope of the mountain without turning from side-to-side or traversing the slope. Hall "bounded off the bumps as he went," and "[t]he terrain was controlling [Hall]" rather than the other way around. In Allen's opinion, Hall was skiing too fast for the skill level he demonstrated, and Hall was out of control "if you define 'out of control' as [not] being able to stop or avoid someone." Although he watched Hall long enough to note Hall's unsafe skiing—approximately two or three seconds—Allen did not see the collision.

Detective McWilliam investigated the collision for the Eagle County Sheriff's office. McWilliam testified that Deputy Mossness said that while Hall could not remember the collision, Hall admitted that as he flew off a knoll and looked down, he saw people below him but could not stop because of the bumps:

Mr. Hall told [the deputy] that he had been skiing that day, he was an employee of Vail Associates. That he was coming down the mountain and that he—he said he flew off of a knoll, looked down and saw some people below him down the slope, tried to slow down, and that because of the bumps, he wasn't able to stop. And he doesn't remember beyond that point. But he was told that somebody—that he had collided with someone.

McWilliam testified that he interviewed Jonathan Cherin, an eyewitness to the collision between Hall and Cobb. Cherin stated that he saw Hall skiing straight down the slope at a high speed and out of control. He said that Cobb, who appeared to be an inexperienced skier, traversed the slope below Hall when Hall hit some bumps, became airborne, and struck Cobb.

McWilliam testified that Deputy Bishop, an officer on the scene, told McWilliam about the observations of other witnesses to the collision. Bruce Yim said that Hall was skiing too fast, that he was out of control, and that Hall collided with Cobb as Cobb traversed the slope. Loic Lemaner, who was skiing below Cobb at the time of the collision, saw Hall after the collision. Lemaner said that after the collision, Hall struck Lemaner's skis and poles, breaking one of Lemaner's poles in half.

McWilliam said that the trail was 156 feet across at the point of the collision. Cobb's body came to rest slightly to the right of the center of the slope. Hall came to rest in the center of the trail, approximately eighty-three feet below Cobb's body.

Upon cross-examination, McWilliam testified that in eleven years' experience in Eagle County, he was aware of two other collisions between skiers on Vail mountain that resulted in the death of a skier. McWilliam said that deaths on Vail mountain from such collisions are rare.

Sandberg, an investigator for the District Attorney's office, testified that he spoke with Mark Haynes, who had been Hall's high school ski coach. Haynes told Sandberg that in the years he coached Hall, Hall was one of the top two or three skiers on the team and that Hall was "talented and aggressive." Haynes said that Hall participated in slalom

and giant slalom races when he was in high school. Haynes taught his skiers to ski safely and under control.

Dr. Ben Galloway, the coroner who performed the autopsy on Cobb's body, testified that Cobb died from a single and traumatic blow to his head that fractured his skull and caused severe brain injuries. The coroner said that the injury was consistent with the impact from an object, such as a ski, striking Cobb's head on a perpendicular plane. In addition to the skull fractures and brain injuries, Cobb had a contusion or bruise around his right eye and had an abrasion across his nose. Although he noted the effects of the failed resuscitation efforts, Galloway saw no signs of trauma to any other parts of Cobb's body, indicating that Cobb's head was the sole area of contact.

Galloway testified that Hall struck Cobb just below his right ear, in an area of the skull where the bones are thickest and "it takes more force to fracture those areas" than other areas of the skull. Galloway described the injury as an "extensive basal skull fracture" with "components" or smaller fractures that extended from the major fracture. The damage to Cobb's skull resulted in "contusions or bruises" on Cobb's brain, a subdural hemorrhage near the brain stem, and "marked swelling of the brain due to cerebral edema." This trauma to Cobb's brain led to cardiorespiratory failure, the cause of Cobb's death. Galloway noted that as a result of the bleeding from Cobb's brain, Cobb aspirated blood into his lungs, "which certainly compromised his ability to breathe." Galloway found that the severe head injury was the sole cause of Cobb's death.

Galloway testified that "it would take considerable force" to cause such an injury, typically seen in automobile accident victims who sustain basal skull fractures after being thrown from moving vehicles:

> In my experience in my practice spanning some 25 years, you most commonly see this type of fracturing when someone is thrown out of an automobile or a moving vehicle and sustains a basal skull fracture.

Although Galloway could not estimate Hall's speed based on Cobb's injury, Galloway opined that Hall must have been travelling at a very high rate of speed to generate the force necessary to cause Cobb's skull fracture and brain injuries:

> All I can say is that based on my experience it took a significant amount of force to cause this, and if you look at kinetic energy formula ... speed is a very important aspect of that energy. Because the speed is squared, you know, it's logarithmic, not arithmetic.
>
> ....
>
> I've seen this injury in other areas, and other circumstances when we knew how fast an automobile was going, and we would see this type of injury, it—it requires a significant amount of speed that generates the force to cause this injury.

Following the presentation of these witnesses, the county court considered whether there was sufficient evidence to find probable cause that Hall recklessly caused Cobb's death. The county court reviewed other Colorado manslaughter cases where courts found substantial and unjustified risks of death resulting from conduct such as firing a gun at a person or kicking an unconscious person in the head. The court found that Hall's conduct—which the court characterized as skiing "too fast for the conditions"—did not involve a substantial and unjustifiable risk of death and "does not rise to the level of dangerousness required under the current case law" to sustain a count of manslaughter. Because Hall's conduct did not, in the court's view, involve a substantial and unjustifiable risk of death, the court found that the prosecution failed to provide sufficient proof that Hall acted recklessly. The county court therefore dismissed the manslaughter count.

The prosecution appealed the county court's decision to the district court pursuant to Crim. P. 5(a)(4)(IV). The district court agreed with the county court that the prosecution failed to establish probable cause. The court held that Hall's conduct did not involve a substantial risk of death because any risk created by Hall had a less than fifty percent chance of causing another's death. The district court relied on language from

our decisions in *People v. Thomas*[3] and *People v. DelGuidice*[4] to determine that for a risk of death to be substantial, "it should be at least more likely than not that *death* would result." (Emphasis in original.) The court ruled that when viewed in the light most favorable to the People, the facts showed that Hall was "skiing too fast for the snow conditions." The district court held that while such conduct may involve a substantial risk of injury, a person of ordinary prudence and caution would not infer that skiing too fast for the conditions creates at least a fifty percent chance of death. Thus, the court held that the prosecution failed to meet its burden and affirmed the county court's finding of no probable cause.

The People petitioned this court pursuant to C.A.R. 49, and we granted certiorari to consider the following:

(1) Whether the district court erred by establishing *"more likely than not"* as the level of substantial risk of death that a defendant must disregard for a finding of probable cause that he caused the death of another recklessly; and

(2) Whether the district court reviewed the wrong criteria and neglected the evidence relating specifically to this case in affirming the county court's dismissal of a manslaughter charge at preliminary hearing.

## III. DISCUSSION

### A. Appellate Procedure

■ Before addressing the substantive issues raised in this appeal, we first consider a matter of procedure raised by the defendant. Hall argues that the People did not follow the appropriate procedures to bring this appeal to this court, claiming that "the procedure in this case is not authorized by case law or court rule." We hold otherwise. The rules and statutes governing preliminary hearings and appeals from those hearings

**3.** 729 P.2d 972 (Colo.1986).

**4.** 199 Colo. 41, 606 P.2d 840 (1979).

**5.** By contrast, the defendant has no right of appeal from a finding of probable cause because the statute allows only the prosecution to appeal

provide for the form of review sought in this case.

■ Rule 5(a)(4)(IV) expressly provides the prosecution the right to appeal a county court's finding of no probable cause to the district court:

(IV) If from the evidence it appears to the county court that there is not probable cause to believe that the offense charged has been committed by the defendant, the county court shall dismiss the complaint and discharge the defendant. *If the prosecutor believes the court erred in its finding of no probable cause, the prosecutor may appeal the ruling to the district court.*[5]

(Emphasis added.) Thus, the People have a right to appeal to the district court.

Hall argues that in *Abbott v. County Court*, we stated that the prosecution's "sole remedy" regarding a county court finding of no probable cause is requesting to file a direct information in the district court under Crim. P. 5(a)(4)(V), and if this request is denied then the prosecution may only petition this court to grant relief under C.A.R. 21. *See* 886 P.2d 730, 735 (Colo.1994). In *Abbott*, we addressed two issues. First, we considered whether, pursuant to an extraordinary writ under C.R.C.P. 106, the district court had authority to review the sufficiency of the county court's finding of probable cause, and we concluded that the district court had no such authority. *See id.* at 731–32. Second, we addressed whether, after the district court improperly considered and reversed the county court's finding of probable cause in a Rule 106 proceeding, the People should have appealed that decision directly to this court pursuant to C.A.R. 21, or if the People could appeal to the court of appeals. *See id.* at 731. We held that the People could appeal the district court's decision either to this court under C.A.R. 21 or to the court of appeals. *See id.* at 735.

As part of our analysis of the second issue in *Abbott*, we stated:

from the county court. *See Abbott v. County Court*, 886 P.2d 730, 732 (Colo.1994). A defendant may seek relief in the form of an extraordinary writ from this court pursuant to C.A.R. 21. *See id.*

Similar limitations apply when the People appeal a finding of no probable cause. When the preliminary hearing is initially conducted in county court, the People's only remedy for an erroneous finding of no probable cause is to seek permission to file a direct information in the district court pursuant to Crim. P. 5(a)(4)(V).

*Id.* at 735. Hall relies on these two sentences for his contention that the People have no authority to bring the appeal in this case. However, because these sentences from *Abbott* are obiter dictum and because they incorrectly stated the appellate procedures for preliminary hearings, we disagree.

The two sentences quoted above were not necessary to our resolution of the procedural question presented in *Abbott* and thus do not serve as precedent. In *Abbott,* the People appealed a ruling by the district court in a Rule 106 proceeding; they did not appeal a finding of no probable cause by a county court. Hence, our discussion of the People's right to appeal a finding of no probable cause under Crim. P. 5 was extraneous to our resolution of the issue raised in *Abbott* and these sentences are obiter dictum.

Additionally, the two sentences quoted from *Abbott* incorrectly state the appellate procedures for preliminary hearings. In *Abbott,* we relied on the 1984 version of Crim. P. 5 for the assertion that the People's "sole remedy" from a county court's finding of no probable cause is to appeal under C.A.R. 21. *See id.* at 735 n. 10 (quoting Crim. P. 5 from "7B C.R.S. (1984)"). However, we amended the rule effective in 1989 to provide the prosecution with a right to appeal a county court's finding of no probable cause to the district court. *See* 7B C.R.S. at 49 (1984) (1989 Supp.). The county court conducted the preliminary hearing in *Abbott* in March 1992. Thus, we should have applied the 1989 version of the rule that clearly provides the prosecution a right to appeal a finding of no probable cause to the district court.

Although we expressly disavow those two sentences because they are erroneous dictum, we note that the central holdings in *Abbott* are unaffected.

■ Having established that the prosecution has a right to appeal to the district court from a county court's finding of no probable cause, we turn to the People's right to appeal the district court's decision affirming that finding. The county court's dismissal of the only felony charge against Hall is a final judgment for purposes of appellate jurisdiction. *See People v. Gallegos,* 946 P.2d 946, 950 (Colo.1997) (discussing the finality of criminal judgments). Because Crim. P. 5(a)(4)(IV) expressly provides the People a right to appeal the county court's finding of no probable cause to the district court and because the finding is a final judgment for purposes of appellate jurisdiction, section 13–6–310 governs the district court's review of an appeal from the county court. Section 13–6–310(4) provides that the district court's review of the county court's decision may be appealed to this court by writ of certiorari:

Further appeal to the supreme court from a determination of the district court in a matter appealed to such court from the county court *may be made only upon writ of certiorari* issued in the discretion of supreme court pursuant to such rules as that court may promulgate. (Emphasis added.)

Thus, the prosecution has a right to appeal the county court's probable cause decision to the district court and to seek certiorari review in this court of the district court's decision. Accordingly, we hold that the People brought this appeal pursuant to authorized procedure.

### B. Manslaughter and Recklessness

Having established that the People followed proper procedures in bringing this appeal, we discuss the substantive issues presented in this case. To provide background for our explanation of recklessness, we review the history of culpable mental states under our criminal code. We then examine the separate elements of recklessness, which require that an actor consciously disregard a substantial and unjustifiable risk that a result will occur or that a circumstance exists. *See* § 18–1–501(8). Based on this review, we hold that to determine whether a risk is substantial and unjustified, a trier of fact

must weigh the likelihood and potential magnitude of harm presented by the conduct and consider whether the conduct constitutes a gross deviation from the reasonable standard of care. Whether a person consciously disregards such a risk may be inferred from either the actor's subjective knowledge of the risk or from what a reasonable person with the actor's knowledge and experience would have been aware of in the particular situation.

■ With the exception of strict liability crimes, a person is not subject to criminal sanctions unless the prosecution establishes that, in addition to committing a proscribed act, the person acted with the culpable mental state required for the particular crime. *See* § 40–1–602, cmt., 3 C.R.S. (1971 Supp.) (discussing principles of criminal culpability). In other words, except for strict liability crimes, our criminal justice system will not punish a defendant for her actions unless she acted with a state of mind that warrants punishment.

In the past, courts and legislatures developed a variety of definitions for different mental states, creating confusion about what the prosecution had to prove in a criminal case. *See* Model Penal Code § 2.02, cmt. at 230 (1985) [hereinafter MPC]. Depending on the specific crime charged and the jurisdiction, juries might be instructed to determine whether the defendant acted with " 'felonious intent,' 'criminal intent,' 'malice aforethought,' 'guilty knowledge,' 'fraudulent intent,' 'wilfulness,' 'scienter,' . . . or 'mens rea,' to signify an evil purpose or mental culpability." *Morissette v. United States,* 342 U.S. 246, 252, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

In addition to the variety of mental states required for different crimes, single crimes often referred to a number of different mental states, further complicating an analysis of culpability requirements. For example, Colorado's statute, "Driving under influence—death," stated:

> Any person while under the influence of intoxicating liquor or of any exhilarating or stupefying drug, who causes the death of another by operating or driving any automobile, motorcycle, or other motor vehicle in a *reckless, negligent,* or *careless* manner, or with a *wanton or reckless disregard of human life or safety,* shall be deemed guilty of a felony and upon conviction shall be punished by imprisonment in the state penitentiary for a period of not less than one year nor more than fourteen years.

§ 40–2–10, 3 C.R.S. (1963) (emphasis added). In order to eliminate the confusion created by this variety of ill-defined mental states, the Model Penal Code suggested that criminal codes articulate and define the specific culpable mental states that will suffice for criminal liability. *See* MPC § 2.02, cmt. at 229.

As part of a complete revision of Colorado's criminal code in 1971, the General Assembly followed the Model Penal Code's suggestion and adopted a provision specifically defining four culpable mental states: "intentionally," [6] "knowingly," [7] "recklessly," [8] and "criminal negligence." [9] *See* ch. 121, § 40–1–

6. Under the current statutory scheme, statutes in which the culpability requirement is expressed as "intentionally" or "with intent" are specific intent crimes:
 [A] person acts "intentionally" or "with intent" when his conscious objective is to cause the specific result proscribed by the statute defining the offense. It is immaterial to the issue of specific intent whether or not the result actually occurred.
 § 18–1–501(5), 6 C.R.S. (1999).

7. Under section 18–1–501(6), crimes defined by a culpable mental state of "knowingly" or "willfully" are "general intent" crimes, and:
 A person acts "knowingly" or "willfully" with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such a nature that such a circumstance exists. A person acts "knowingly" or "willfully," with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result.

8. Under section 18–1–501(8):
 A person acts recklessly when he consciously disregards a substantial and unjustified risk that a result will occur or that a circumstance exists.

9. Under section 18–1–501(3):
 A person acts with criminal negligence when, through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists.

601, 1971 Colo. Sess. Laws 388, 403–04.[10] The legislature adopted this section to define clearly the different levels of culpability that could be required for the commission of various offenses. *See* § 40–1–602, cmt., 3 C.R.S. (1971 Supp.). The definitions have been amended since their adoption in 1971, and section 18–1–501 currently provides detailed explanations of what each level of culpability requires.

To be convicted of any crime other than a strict liability crime, a defendant must act with one of these four culpable mental states, depending on the statutory definition of each particular crime. If the elements for the required mental state are not satisfied, the defendant cannot be convicted of the crime charged.

To demonstrate that Hall committed the crime of manslaughter, the prosecution must provide sufficient evidence to show that the defendant's conduct was reckless. § 18–3–104(1)(a).[11] Thus, we focus on describing the mental state of recklessness and determining whether Hall's conduct meets that definition.

As Colorado's criminal code defines recklessness, "A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur or a that circumstance exists." § 18–1–501(8). Thus, in the case of manslaughter, the prosecution must show that the defendant's conduct caused the death of another and that the defendant:

1) *consciously disregarded*

2) a *substantial* and

3) *unjustifiable risk* that he would

4) *cause the death of another.*

We examine these elements in detail.

### Substantial and Unjustifiable Risk

■ To show that a person acted recklessly, the prosecution must establish that the person's conduct created a "substantial

and unjustifiable" risk. The district court construed some of our earlier cases as requiring that the risk of death be "at least more likely than not" to constitute a substantial and unjustifiable risk of death. In interpreting our cases, the court relied on an erroneous definition of a "substantial and unjustifiable" risk. Whether a risk is substantial must be determined by assessing both the likelihood that harm will occur and the magnitude of the harm should it occur. We hold that whether a risk is unjustifiable must be determined by assessing the nature and purpose of the actor's conduct relative to how substantial the risk is. Finally, in order for conduct to be reckless, the risk must be of such a nature that its disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise.

■ A risk does not have to be "more likely than not to occur" or "probable" in order to be substantial. A risk may be substantial even if the chance that the harm will occur is well below fifty percent. *See People v. Deskins,* 927 P.2d 368, 373 (Colo.1996) (finding reckless conduct where defendant disregarded risk that "any of the cars on the road" on a particular night might contain children) (emphasis omitted); *see also* Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.7(f) at 336 (1986). Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. For example, if a person holds a revolver with a single bullet in one of the chambers, points the gun at another's head and pulls the trigger, then the risk of death is substantial even though the odds that death will result are no better than one in six. As one court remarked,

If the potential of a risk is death, that risk is always serious. Therefore, only *some likelihood* that death will occur *might cre-*

---

**10.** Because the General Assembly specifically cited both the Model Penal Code and the New York Code and their commentaries as models for Colorado's code, we consider those sources useful aids for construing the definitions of culpable mental states. *See* § 40–1–602, cmt., 3 C.R.S. (1971 Supp.).

**11.** Section 18–3–104 reads in pertinent part:

(1) A person commits the crime of manslaughter if:

(a) Such person recklessly causes the death of another person.

*ate* for most people a "substantial and unjustifiable" risk....

*State v. Standiford,* 769 P.2d 254, 263 n. 9 (Utah 1988) (emphasis added). Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm, mindful that a risk may be "substantial" even if the odds of the harm occurring are lower than fifty percent.

■ Whether a risk is substantial is a matter of fact that will depend on the specific circumstances of each case. Some conduct almost always carries a substantial risk of death, such as engaging another person in a fight with a deadly weapon or firing a gun at another. *See, e.g., Case v. People,* 774 P.2d 866, 870 (Colo.1989) (upholding manslaughter conviction where defendant stabbed victim three times during a fight); *Thomas,* 729 P.2d at 977 (affirming conviction of attempted reckless manslaughter where defendant fired three shots at victim). In such instances, the substantiality of the risk may be evident from the nature of the defendant's conduct and the court will not have to examine the specific facts in detail.

Other conduct requires a greater inquiry into the facts of the case to determine whether it creates a substantial risk of death. In *Moore v. People,* we affirmed a manslaughter conviction where the defendant kicked the victim to death. 925 P.2d 264, 269 (Colo. 1996). While "kicking another" may not necessarily involve a substantial risk of death, a trier of fact can find that repeatedly kicking the head and torso of someone already beaten unconscious can create a substantial risk of death. *See id.* Similarly, driving a car is not conduct that by its nature necessarily involves a substantial risk of death to others, but after viewing the facts of a particular case closely a court may determine that the defendant created a substantial risk of death. *See, e.g., People v. Clary,* 950 P.2d 654, 658–59 (Colo.App.1997) (finding that driving a truck without adequate brakes constituted reckless conduct for vehicular homicide count).

■ A court cannot generically characterize the actor's conduct (e.g., "driving a truck") in a manner that ignores the specific elements of the conduct that create a risk (e.g., driving a truck with failing brakes on a highway). For example, "installing a heater" carries little risk under normal circumstances. However, the Connecticut Supreme Court held that improperly wiring a 120–volt heater to a 240–volt circuit, failing to use a lock nut to connect the heater to the circuit breaker, and using other faulty installation techniques creates a substantial risk of "catastrophic fire" and death. *See State v. Salz,* 226 Conn. 20, 627 A.2d 862, 865, 869–71 (1993). Thus, to determine whether the conduct created a substantial risk of death, a court must inquire beyond the general nature of the defendant's conduct and consider the specific conduct in which the defendant engaged.

■ As well as being substantial, a risk must be unjustifiable in order for a person's conduct to be reckless. Whether a risk is justifiable is determined by weighing the nature and purpose of the actor's conduct against the risk created by that conduct. *See* MPC, § 2.02, cmt. at 125 (Tentative Draft No. 4 1955); *see also* David M. Treiman, *Recklessness and the Model Penal Code,* 9 Am. J.Crim. L. 281, 334 (1981). If a person consciously disregards a substantial risk of death but does so in order to advance an interest that justifies such a risk, the conduct is not reckless. For example, if a surgeon performs an operation on a patient that has a seventy-five percent chance of killing the patient, but the patient will certainly die without the operation, then the conduct is justified and thus not reckless even though the risk is substantial. *See* MPC, Tentative Draft No. 4, § 2.02, cmt. at 125.

■ In addition to the separate analyses that are applied to determine whether a risk is both "substantial" and "unjustified," the concept of a "substantial and unjustifiable risk" implies a risk that constitutes a gross deviation from the standard of care that a reasonable law-abiding person would exercise under the circumstances. Both the

Model Penal Code and the New York Code, which the General Assembly followed in drafting the Colorado criminal code, expressly define a "substantial and unjustifiable risk" as one that is a gross deviation from the reasonable standard of care. *See* MPC, § 2.02 at 226; N.Y. Penal Law, § 15.05. A substantial and unjustifiable risk must constitute a "gross deviation" from the reasonable standard of care in order to justify the criminal sanctions imposed for criminal negligence or reckless conduct, as opposed to the kind of deviation from the reasonable standard of care that results in civil liability for ordinary negligence. *See* Treiman, *supra*, at 337.[12]

 Whether a risk is substantial and unjustified is a question of fact. *See* MPC, Tentative Draft No. 4, § 2.02, cmt. at 125; *Cf. People v. Thompson*, 748 P.2d 793, 794 (Colo.1988) (finding that question of whether a risk of serious bodily injury was a substantial risk is a question for the jury); *People v. Mann*, 646 P.2d 352, 362 (Colo.1982) (stating that question of whether the defendant's conduct was a "gross deviation" from the standard of care is a question for the jury). Hence, at trial, the trier of fact must determine whether the facts presented prove beyond a reasonable doubt that the risk was substantial and unjustified. In the limited context of a preliminary hearing, the court must determine whether a risk was substantial and unjustified by considering the evidence presented in the light most favorable to the prosecution, and the court must ask whether a reasonable person could "entertain" the belief—though not necessarily conclude beyond a reasonable doubt—that the defendant's conduct was reckless based on that evidence.

### Conscious Disregard

 In addition to showing that a person created a substantial and unjustifiable risk, the prosecution must demonstrate that the actor "consciously disregarded" the risk in order to prove that she acted recklessly. A person acts with a conscious disregard of the risk created by her conduct when she is aware of the risk and chooses to act despite that risk. *See Shaw*, 646 P.2d at 380; MPC, Tentative Draft No. 4, § 2.02 cmt. at 125 (describing reckless conduct as "conscious risk creation"). In contrast to acting "intentionally" or "knowingly," the actor does not have to intend the result or be "practically certain" that the result will occur, he only needs to be "aware" that the risk exists. *See Moore*, 925 P.2d at 267–68 n. 6 (discussing different levels of culpability); *Deskins*, 927 P.2d at 373 (finding sufficient evidence in record to support jury's conclusion that defendant was aware of risk that "any of the cars on the road" on given night might contain children). The statutory definitions of culpable mental states make these distinctions clear. *Compare* §§ 18–1–501(5) ("A person acts 'intentionally' or 'with intent' when his *conscious objective* is to cause the specific result ....") (emphasis added); – 501(6) ("A person acts 'knowingly' or 'willfully' ... when he is aware that his conduct is *practically certain* to cause the result.") (emphasis added) *with* § 18–1–501(8) (defining "reckless" as a *conscious disregard* of a substantial and unjustifiable risk) (emphasis added).

 Although recklessness is a less culpable mental state than intentionally or knowingly, it involves a higher level of culpability than criminal negligence. Criminal negligence requires that, "through a gross deviation from the standard of care that a reasonable person would exercise," the actor fails to perceive a substantial and unjustifiable risk that a result will occur or a circumstance exists. § 18–1–501(3); *see also People v. Jones*, 193 Colo. 250, 253–54, 565 P.2d 1333, 1335 (1977) (discussing criminally negligent homicide). An actor is criminally negligent when he should have been aware of the risk but was not, while recklessness requires

---

12. We note that both criminal negligence and recklessness require that the actor's conduct involve a "gross deviation" from the standard of care that a reasonable person would exercise under the circumstances in each case. Thus, the same risk will suffice for either criminally negligent or reckless conduct. However, the standards are sufficiently distinct to justify unequal penalties because in the case of reckless conduct *the actor must be aware of the risk* he creates, while criminally negligent conduct requires only that he failed to perceive the risk. *See People v. Shaw*, 646 P.2d 375, 380 (Colo.1982).

that the defendant actually be aware of the risk but disregard it. *See Shaw*, 646 P.2d at 380. Thus, even if she should be, a person who is not actually aware that her conduct creates a substantial and unjustifiable risk is not acting recklessly.

A court or trier of fact may infer a person's subjective awareness of a risk from the particular facts of a case, including the person's particular knowledge or expertise. *Cf. People v. Mingo*, 196 Colo. 315, 318, 584 P.2d 632, 634 (1978) (finding that "subjective awareness of the probability of consequences" often must be inferred from the defendant's conduct and surrounding circumstances). For example, a court may infer a person's subjective awareness of the risks created by firing a gun from the facts that the person served an extended tour of duty in the military as a rifleman and machine gunner and was instructed by both the army and his father not to point a gun at another person. *See Murray v. State*, 855 P.2d 350, 357 (Wyo.1993). A court may infer from a person's extensive training and safety instruction that the person understood the risks of fire and other "catastrophic dangers" created by the "slipshod" installation of a baseboard heater. *See Salz*, 627 A.2d at 869–70.

In addition to the actor's knowledge and experience, a court may infer the actor's subjective awareness of a risk from what a reasonable person would have understood under the circumstances. *See* Treiman, *supra*, at 357. When a court infers the defendant's subjective awareness of a risk from what a reasonable person in the circumstances would have known, the court may consider the perspective of a reasonable person in the situation and with the knowledge and training of the actor. *See id.* Although a court can infer what the defendant actually knew based on what a reasonable person would have known in the circumstances, a court must not confuse what a reasonable person would have known in the circumstances with what the defendant actually knew. *See id.* Thus, if a defendant engaged in conduct that a reasonable person would have understood as creating a substantial and unjustifiable risk of death, the court may

infer that the defendant was subjectively aware of that risk, but the court cannot hold the defendant responsible if she were actually unaware of a risk that a reasonable person would have perceived.

Hence, in a reckless manslaughter case, the prosecution must prove that the defendant acted despite his subjective awareness of a substantial and unjustifiable risk of death from his conduct. Because absent an admission by the defendant such awareness cannot be proven directly, the court or trier of fact may infer the defendant's awareness of the risk from circumstances such as the defendant's training, knowledge, and prior experiences, or from what a reasonable person would have understood under the circumstances.

### Risk of Death

The final element of recklessness requires that the actor consciously disregard a substantial and unjustifiable risk of a particular result, and in the case of manslaughter the actor must risk causing death to another person. The risk can be a risk of death to another generally; the actor does not have to risk death to a specific individual. *Cf. Deskins*, 927 P.2d at 373 (finding that defendant engaged in substantial and unjustifiable risk that any car on the road, not just the one he hit, might contain children). Because the element of a "substantial and unjustifiable risk" measures the likelihood and magnitude of the risk disregarded by the actor, any risk of death will meet the requirement that the actor, by his conduct, risks death to another. That is, only a slight risk of death to another person is necessary to meet this element.

### IV. APPLICATION OF LEGAL PRINCIPLES TO HALL'S CONDUCT

#### A. Standard of Proof and Review for Preliminary Hearing

Before we review the district court's decision affirming the county court's dismissal of the manslaughter charge against Hall for lack of probable cause, we discuss

the principles governing a court's determination of probable cause at a preliminary hearing. Under Crim. P. 5(a)(4), a person accused of a felony has a right to a preliminary hearing to determine whether probable cause exists to believe that the defendant committed the offense charged in the felony complaint. In general, a preliminary hearing serves a limited purpose: to determine if there is probable cause to believe that the defendant committed the crime charged. *See People v. District Court (Henry)*, 926 P.2d 567, 570 (Colo.1996). To establish probable cause at a preliminary hearing, the prosecution must "present evidence sufficient to induce a person of ordinary prudence and caution to entertain a reasonable belief that the defendant committed the crime charged." *Id.* The prosecution does not have to establish beyond a reasonable doubt that the defendant committed the crime or even the likelihood that the defendant committed the crime. *See id.*

During a preliminary hearing, the court may consider evidence that might not be admissible at trial, such as hearsay. *See Maestas v. District Court*, 189 Colo. 443, 446, 541 P.2d 889, 891 (1975). The court must view all evidence and draw all inferences in favor of the prosecution, and the court must not accept the defendant's version of the facts over the legitimate inferences that can be drawn from the prosecution's evidence. *See People v. District Court (Cloud)*, 803 P.2d 193, 196 (Colo.1990). The court should not review the merits of the prosecution's factual assertions because that function should be left for the trier of fact if the case goes to trial. *See id.*

Generally, we review a district's court decision upholding the county court's finding of no probable cause under an abuse of discretion standard. *See Henry*, 926 P.2d

at 572. However, we review conclusions of law de novo. *See Valdez v. People*, 966 P.2d 587, 590 (Colo.1998). If we determine that a lower court applied an erroneous construction of law at a preliminary hearing, we will review the record and determine whether the facts, when viewed in the light most favorable to the prosecution, would induce a reasonably prudent and cautious person to entertain the belief that the defendant committed the crime charged. *See People v. Villapando*, 984 P.2d 51, 54–56 (Colo.1999) (reviewing facts presented at preliminary hearing under correctly stated legal standard).

### B. Review of Hall's Conduct

The district court's conclusion that Hall's conduct did not represent a substantial and unjustifiable risk of death rested on an erroneous construction of recklessness. Relying on two of our earlier cases, the court found that for a risk to be "substantial" it must "be *at least more likely than not* that death would result."[13] (Emphasis added.) As discussed, a risk of death that has less than a fifty percent chance of occurring may nonetheless be a substantial risk depending on the circumstances of the particular case. Because the district court applied a flawed interpretation of the law, we hold that the district court's assessment of probable cause was in error. *See Villapando*, 984 P.2d at 55.

Because the district court relied on an erroneous legal standard, we consider this case in light of the standard we explain above. Because this case was dismissed at the preliminary hearing, we must consider the facts in the light most favorable to the prosecution and we must draw all inferences against the defendant. Furthermore, the

---

**13.** The district court cited *DelGuidice*, in which we stated that the difference between "knowingly" and "recklessly" "mirrors the distinction between practically certain of the result on the one hand, and *probability or contingency* of result on the other." 199 Colo. at 43, 606 P.2d at 842 (emphasis added). The district court also relied on *Thomas*, in which we referred to the defendant's "disregard for the *likelihood* that another will die." 729 P.2d at 976 (emphasis added). While the court's reliance on this language is

understandable, it is misplaced. We did not intend for the terms "probability or contingency" or "likelihood" to mean that the actor must be aware of a greater than 50% chance that his conduct will produce the result, as the district court concluded. Instead, we meant only that the actor must be aware of *some chance* of the result occurring, even if the probability is less than 50%. *Cf. Deskins*, 927 P.2d at 373 (finding reckless conduct where defendant took risk that any car on the road might contain children).

prosecution does not have to satisfy the much higher burden of proof necessary to convict Hall of reckless manslaughter. Rather, it need only establish sufficient evidence so that a reasonably prudent and cautious person could entertain the belief that Hall committed the crime.

We first ask whether the prosecution presented sufficient evidence to show that Hall's conduct created a substantial and unjustifiable risk of death. Like other activities that generally do not involve a substantial risk of death, such as driving a car or installing a heater, "skiing too fast for the conditions" is not widely considered behavior that constitutes a high degree of risk. However, we hold that the specific facts in this case support a reasonable inference that Hall created a substantial and unjustifiable risk that he would cause another's death.

Several witnesses stated that Hall was skiing very fast. Allen and the other eyewitnesses all said that Hall was travelling too fast for the conditions, at an excessive rate of speed, and that he was out of control. Allen said that Hall passed him on the slope travelling three times faster than Allen, himself an expert skier. Sandberg presented testimony that Hall was a ski racer, indicating that Hall was trained to attain and ski at much faster speeds than even skilled and experienced recreational skiers. The witnesses said that Hall was travelling straight down the slope at such high speeds that, because of his lack of control, he would not have been able to stop or avoid another person.

In addition to statements of witnesses, the nature of Cobb's injuries and other facts of the collision support the inference that Hall was skiing at an inordinately high speed when he struck Cobb. As Dr. Galloway testified, the severe injuries Cobb sustained were consistent with a person being thrown from a moving automobile during a crash. The coroner said that although he could not estimate Hall's speed from Cobb's injuries, Hall must have been travelling with "a significant amount of speed" to generate sufficient force to cause a basal skull fracture and brain injuries like Cobb's. Additionally, Hall crashed through Lemaner's skis and poles after he struck Cobb—breaking one of the poles in half—indicating a very high speed and great deal of force. Hall came to rest over eighty feet past Cobb's body, further suggesting that Hall was skiing at exceptionally high speeds. Thus, based on the testimony of the witnesses and the coroner's examination of Cobb's body, a reasonable person could conclude that Hall was skiing at very high speeds, thereby creating a risk of serious injury or death in the event of a skier-to-skier collision.

In addition to Hall's excessive speed, Hall was out of control and unable to avoid a collision with another person. All the witnesses said Hall was not traversing the slope and that he was skiing straight down the fall line. Hall was back on his skis, with his ski tips in the air and his arms out to his sides to maintain balance. Allen said that Hall was bounced around by the moguls on the slope rather than skiing in control and managing the bumps. Hall admitted to Deputy Mossness that he first saw Cobb when he was airborne and that he was unable to stop when he saw people below him just before the collision. Hence, in addition to finding that Hall was skiing at a very high rate of speed, a reasonably prudent person could have concluded that Hall was unable to anticipate or avoid a potential collision with a skier on the trail below him.

While skiing ordinarily carries a very low risk of death to other skiers, a reasonable person could have concluded that Hall's excessive speed, lack of control, and improper technique for skiing bumps significantly increased both the likelihood that a collision would occur and the extent of the injuries that might result from such a collision, including the possibility of death, in the event that a person like Cobb unwittingly crossed Hall's downhill path. McWilliam testified that he was aware of only two other deaths from skier collisions on Vail mountain in the past eleven years, but a reasonable person could have determined that Hall's conduct was precisely the type of skiing that risked this rare result.

We next ask whether a reasonable person could have concluded that Hall's creation of a substantial risk of death was unjustified. To the extent that Hall's extremely fast and

unsafe skiing created a risk of death, Hall was serving no direct interest other than his own enjoyment. Although the sport often involves high speeds and even moments where a skier is temporarily out of control, a reasonable person could determine that the enjoyment of skiing does not justify skiing at the speeds and with the lack of control Hall exhibited. Thus, a reasonable person could have found that Hall's creation of a substantial risk was unjustifiable.

In addition to our conclusion that a reasonable person could have entertained the belief that Hall's conduct created a substantial and unjustifiable risk, we must ask whether Hall's conduct constituted a "gross deviation" from the standard of care that a reasonable law-abiding person (in this case, a reasonable, law-abiding, trained ski racer and resort employee) would have observed in the circumstances.

■ As we noted, the nature of the sport involves moments of high speeds and temporary losses of control. *See also* § 33–44–102 (recognizing "the dangers that inhere in the sport of skiing"). However, the General Assembly imposed upon a skier the duty to avoid collisions with any person or object below him. *See* § 33–44–109(2).[14] Although this statute may not form the basis of criminal liability, it establishes the minimum standard of care for uphill skiers and, for the purposes of civil negligence suits, creates a rebuttable presumption that the skier is at fault whenever he collides with skiers on the slope below him. *See Pizza v. Wolf Creek Ski Dev. Corp.*, 711 P.2d 671, 676 (Colo.1985). A violation of a skier's duty in an extreme fashion, such as here, may be evidence of conduct that constitutes a "gross deviation" from the standard of care imposed by statute for civil negligence. Hall admitted to Deputy Mossness that as he flew off a knoll, he saw people below him but was unable to stop; Hall was travelling so fast and with so little control that he could not possibly have respected his obligation to avoid skiers below him on the slope. Additionally, Hall skied in

this manner for some time over a considerable distance, demonstrating that his high speeds and lack of control were not the type of momentary lapse of control or inherent danger associated with skiing. Based on the evidence, a reasonable person could conclude that Hall's conduct was a gross deviation from the standard of care that a reasonable, experienced ski racer would have exercised knowing that other people were on the slope in front of him and that he could not see the area below the knolls and bumps over which he was jumping.

Having determined that Hall's conduct created a substantial and unjustified risk of death that is a gross deviation from the reasonable standard of care under the circumstances, we next ask whether a reasonably prudent person could have entertained the belief that Hall consciously disregarded that risk. Hall is a trained ski racer who had been coached about skiing in control and skiing safely. Further, he was an employee of a ski area and had a great deal of skiing experience. Hall's knowledge and training could give rise to the reasonable inference that he was aware of the possibility that by skiing so fast and out of control he might collide with and kill another skier unless he regained control and slowed down.

In addition to inferring Hall's awareness of the risk from Hall's training and experience, a reasonable person with expert training and knowledge of skiing may have realized that skiing at very high speeds without enough control to stop or avoid a collision could seriously injure or kill another skier. A reasonable expert and experienced skier also might understand that in view of his duties under section 33–44–109, he must maintain enough control to avoid collisions with skiers below him on the slope. Thus, both Hall's subjective knowledge and the awareness that a reasonable person with Hall's background would have had support the inference that Hall consciously disregarded the risk he created by acting despite his awareness of the risk.

**14.** Section 33–44–109(2) states:

 Each skier has the duty to maintain control of his speed and course at all times when skiing and to maintain a proper lookout so as to be

able to avoid other skiers and objects. However, the primary duty shall be on the person skiing downhill to avoid collision with any person or objects below him.

Although the risk that he would cause the death of another was probably slight, Hall's conduct created a risk of death. Hall's collision with Cobb involved enough force to kill Cobb and to simulate the type of head injury associated with victims in car accidents. Even though it is a rare occurrence, the court heard testimony that two skiers in the past eleven years died on Vail mountain alone from skier-to-skier collisions. Based on the evidence presented at the preliminary hearing, a reasonable person could conclude that Hall's conduct involved a risk of death.

Thus, interpreting the facts presented in the light most favorable to the prosecution, we hold that a reasonably prudent and cautious person could have entertained the belief that Hall consciously disregarded a substantial and unjustifiable risk that by skiing exceptionally fast and out of control he might collide with and kill another person on the slope.

Obviously, this opinion does not address whether Hall is ultimately guilty of any crime. Rather, we hold only that the People presented sufficient evidence to establish probable cause that Hall committed reckless manslaughter, and the court should have bound Hall's case over for trial.

## V. CONCLUSION

The prosecution provided sufficient evidence at the preliminary hearing to induce a person of reasonable prudence and caution to entertain the belief that Hall consciously disregarded a substantial and unjustifiable risk that he might collide with and kill another skier. A court must inquire into the specific facts of each case to determine whether a risk was substantial and unjustified based on the likelihood of the risk, the potential magnitude of the harm, and the nature and purpose of the actor's conduct. In most instances, "skiing too fast for the conditions" does not create a substantial and unjustifiable risk of death, but the facts in this case are sufficient to lead a reasonable person to determine that Hall consciously disregarded such a risk. Although a reasonable person would not necessarily conclude that the evidence proves beyond a reasonable doubt that Hall committed reckless manslaughter, the evidence is sufficient to meet the limited purpose and low threshold at a preliminary hearing to establish probable cause. Thus, we remand this case to the district court for trial.