Filed 3/9/22  In re F.L. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re F.L., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G060729 |
| Plaintiff and Respondent, | (Super. Ct. No. 19DP1214/A) |
| v. | O P I N I O N |
| C.L., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for the Defendant and Appellant, C.L.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

Celine L. (Mother) appeals the juvenile court's grant of a supplemental petition filed pursuant to Welfare and Institutions Code section 387, removing her four-year-old daughter, F.L., from Mother's physical custody as the underlying dependency case for the child proceeds.

Mother challenges the sufficiency of the evidence for the court's findings that its earlier order allowing Mother joint physical custody was ineffective, that the child was at risk of substantial danger, and that there were no reasonable means short of removal to protect the child. We conclude substantial evidence supports the court's supplemental petition order and affirm.

I

FACTUAL AND PROCEDURAL HISTORY

A. *The Child's Initial Detention and The Juvenile Court's First Protective Custody Warrant*

In September 2019, Mother was arrested on an outstanding warrant for allegedly violating probation, after a police officer made contact with her based on a report that Mother had hit walls, made a mess, and refused to leave a medical center. Then two-year-old F.L. had been with Mother at the location, wearing dirty pajamas and walking barefoot in the parking lot. Mother did not have any food for F.L., money, or wipes to clean the child. Mother reported to the police she was homeless and did not have contact information for D.P., the father of F.L. (Father).

Four days later, the Orange County Social Services Agency (SSA) filed its initial petition for F.L. in this case, alleging among other things that Mother had a history of substance abuse and domestic violence, had failed to care for the needs of F.L.'s older half-siblings, and that Mother did "not have a safe and stable home in which to provide appropriate care for" F.L. The juvenile court ordered F.L. detained, vested the child's

2

custody with SSA for placement, and encouraged Mother to participate in family services offered by SSA.

After F.L. was initially placed with a caregiver, Mother's criminal case arising from her arrest was dismissed because the probation period on which it was based had expired five months earlier. Three months after F.L.'s initial detention, SSA conducted a first child and family team meeting in December 2019 with Mother, Father, and the caregiver. Mother and Father agreed to participate in services offered, including counseling for both parents and drug patch testing for Mother.

One week later, F.L. was released to the custody of Mother, who was then living in an emergency shelter. Two weeks later, however, SSA obtained a protective custody warrant to have the juvenile court detain F.L. because drug patch testing results indicated Mother's use of methamphetamine. SSA then filed an amended petition amending its earlier allegations about Mother's criminal case but maintaining Mother had a history of substance abuse and domestic violence, had failed to care for the needs of F.L.'s older half-siblings, and did not have a safe and stable home for F.L. The child was detained by the court and placed with a foster family. The following day, SSA received communication that Mother had failed to submit two drug patches for testing after her positive result patch.

At the juvenile court's January 2020 jurisdiction hearing, the court found the amended petition allegations true and concluded F.L. fell within the provisions of Welfare and Institutions Code section 300, subdivisions (b)(1) [failure or inability to adequately supervise or protect child] and (j) [abuse or neglect of siblings].[1] Father was assessed for physical custody of F.L.; after F.L. was removed from Mother's custody in May 2020, the court ordered custody to father. (§ 361, subds. (c)(1) [substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child

---

[1] All further statutory designations are to the Welfare and Institutions Code.

3

if returned home and there are no reasonable means to protect the child's physical health without removal].)

B. *Initial Case Plan Progress*

As part of its dispositional ruling, the court approved a case plan submitted by SSA which Mother participated in developing and subsequently signed. In the plan, Mother agreed to be tested for substance use through a drug patch and that "[a]ll drug [and] alcohol tests [were] to be negative." The plan also advised Mother: "If you test positive, you will be required to complete a substance abuse treatment program approved by SSA." As to visitation with F.L., the plan provided that SSA would "authorize a trial of the child in [M]other's home for a period of up to sixty [] days, in advance of reunification if [M]other [] met the case plan requirements."

Based on the minutes of a subsequent child and family team meeting in October 2020, Mother "successfully participated . . . in her case plan elements," including making progress with services offered by SSA, visits with F.L., and a residential substance abuse program at a second shelter. Accordingly, F.L. began a trial visit with Mother, resulting in the then three-year-old child spending equal amounts of time at the respective residences of Mother and Father. During this successful trial period, no welfare concerns were reported and the child reported feeling happy and safe at Mother's home.

As of December 2020, SSA reported that Mother had "continued to test via drug patch and" had "tested sequentially negative [since] September[] 2020." SSA also reported "mother ha[d] proven her ability to provide [for] the child's needs, [including] medical[,] . . . emotional, and [] physical care." Based on Mother's progress, at a six-month review hearing in January 2021, the juvenile court ordered that custody of F.L. be placed jointly with Mother and Father and for family maintenance services to continue for both parents.

4

C. *The Second Protective Custody Warrant and SSA's Section 387 Supplemental Petition*

Mother's progress notwithstanding, she left her residence three months later after refusing to sign a disciplinary warning for returning late from a one-hour pass to change her drug patch. Within a week, SSA received a report from Mother's drug patch testing laboratory indicating a positive test result for heroin use. Mother denied any substance use and claimed the test result was a false positive. She underwent a different drug test the day after the positive patch result communication; that test was negative. SSA's social worker quoted Mother as stating over the phone that she had not used drugs and "ha[d] never used drugs before," claiming: "there are no records of me using drugs."

Mother provided SSA information about food and medications she had taken and SSA made inquiries with the patch testing laboratory whether any of those elements could have caused a false positive result. SSA also conducted another child and family team meeting with Mother, who affirmed she would provide a drug-free environment for F.L. Four days later, the laboratory explained F.L.'s patch had tested positive for a metabolite of heroin and that "[o]nly one drug and that drug being [h]eroin metabolizes down" to that metabolite.

Subsequently, although Mother's next drug patch test result was negative for all substances, ten days later, the following patch again indicated both heroin and methamphetamine use. Five days later, SSA provided Mother with a list of outpatient substance use programs for Mother to enroll in as stipulated in her case plan for positive test results. Mother responded by text message, stating: "No[,] I'm not taking it because I'm not a drug addict. Sorry."

That same day, SSA received a letter from a physician assistant who had been treating Mother for one year. The physician assistant explained she wrote the letter to "document that some of the medications [Mother was] currently taking [could] cause a false positive for various illicit drugs." SSA forwarded the letter to the laboratory and,

5

the following day, spoke with the physician assistant. She reported to SSA that Mother had been diagnosed with posttraumatic stress disorder and polysubstance dependency. The physician assistant further reported Mother had "been compliant in her treatment and ha[d] address[ed] substance use in sessions," including "answering questions about [past] substance use and/or use of methamphetamines," but also stating she was now sober.

On the same day, Mother reported to SSA she had changed her mind about seeking substance abuse treatment and had enrolled in a program. Notwithstanding, Mother maintained she had not used any substances and that the patch results were false positives. The next day, the laboratory reaffirmed its test results to SSA. Then, four days later, the laboratory reported that a third patch result had come back with a positive result, this time for methamphetamine only.

Three days later, SSA applied for another protective custody warrant to again have the juvenile court detain F.L. The application noted that, within the date ranges of Mother's three positive patch results, she had undergone additional randomized drug testing that returned five negative results, two of them falling within the same time frame as the positive results. The warrant application stated Mother continued to deny drug use and that she offered a possible explanation of having "unintentionally touched the surfaces touched by people who actively use drugs." SSA asserted in its application it was "concerned for the safety and well-being of [F.L.]," based on Mother's "unresolved substance abuse issues as evidenced by her positive drug tests for methamphetamine and heroin" and that "removal from [M]other [wa]s necessary."

The juvenile court granted the warrant application and, as had happened 17 months earlier, F.L. was removed from Mother's physical custody. A few days later, SSA filed the section 387 supplemental petition underlying this appeal (the 387 petition). It alleged a combination of Mother's ongoing substance abuse and denial of drug use and asserted the court's then existing order allowing F.L. to remain in Mother's custody under SSA's supervision was ineffective in protecting the child.

6

The court conducted a detention hearing on the petition in June 2021, where Mother asserted that aside from the questionable nature of the patch test results, "there [was] no indication in any report that any use led to inadequate safety or protection or put [F.L.] in danger." The court sustained SSA's allegations and entered an interim protective order placing F.L. with Father only, pending the outcomes of the court's findings on jurisdiction and disposition.

D. *The Challenged 387 Petition Ruling*

The juvenile court combined its jurisdiction and disposition hearings for the 387 petition and, after granting a continuance request by Mother to conduct a hair follicle drug test, conducted the combined hearing on September 16, 2021. It received into evidence six status update reports by SSA, which included information about Mother's positive visits with F.L. and her entry, two months before the hearing, into a residential substance abuse center where she was participating in counseling, parenting education, and testing. The center submitted a letter reporting that Mother was "engaged in her program of recovery and show[ed] much motivation and action to continue maintaining sobriety and personal growth."

The most recent testing update at the hearing was that Mother had continued to submit to different testing that all returned negative results, including the hair follicle test Mother had submitted. As to patch testing, the updates showed that in the three months since F.L. had been removed most recently under the juvenile court's second protective custody warrant, four more patches had returned positive for methamphetamine use but thereafter five patches had returned negative. SSA's update reports showed Mother maintained she had not used drugs and that the patch results were false positives.

Only Mother testified at the hearing. She maintained she had not used the illicit drugs her patch test results had indicated. Although she testified about her different

7

testing that had all returned negative results, Mother acknowledged that of the different test types, the patch testing had the most sensitivity to drug use, meaning a patch test could detect the presence of drugs that Mother's other testing would not necessarily detect. On cross-examination, Mother confirmed she was attending Alcoholics Anonymous and Narcotics Anonymous but stated she did not yet have a sponsor and maintained she did not have any substance abuse issue. She also repeatedly denied ever having used any illicit drugs, including methamphetamine.

During closing arguments, SSA asserted its goal was to reunite F.L. with Mother, but that reunification could not "happen as long as [Mother] continue[d] to deny the struggles of substance abuse that [] led to [F.L.]'s removal." SSA asked that its 387 petition be granted and for Mother to continue receiving services. F.L.'s counsel joined SSA's position, explicitly citing the child's previous removal from Mother's custody following her 2020 positive patch test result for methamphetamine. Counsel commended Mother for her efforts to improve her situation, but stated that F.L.'s desire was for Mother to "get honest with herself regarding the extent and history of her substance abuse." Father similarly noted Mother is a great parent to F.L., but joined with SSA and the minor for the purposes of the court's ruling on the 387 petition.[2]

Mother's counsel reasserted the fact that Mother's positive patch test results lay in the context of many negative different test results, but confirmed Mother's acknowledgement that the different results did not negate the patch results because of the difference in sensitivity levels for the respective tests. Mother cited to her efforts since

---

[2] Mother's briefing cites to portions in the record containing allegations about F.L.'s welfare while in her stepmother and Father's care—e.g.: SSA was "concerned with the supervision the child [wa]s receiving while in the care of the father and the source of [observed] injuries, whether they are intentional or unintentional. [¶] Additionally, the father ha[d] not been transparent regarding his residence." Even if true, the allegations would not change the fact the juvenile court had substantial evidence upon which to base its decision.

8

her alleged positive test results to demonstrate she was "staying sober for" F.L.

After considering the evidence and arguments of counsel, the juvenile court sustained the 387 petition allegations, found reasonable efforts had been made to prevent F.L.'s removal from Mother's custody, and removed the child. The court placed the child with Father and adopted SSA's case plan to continue providing Mother with services and scheduled a six-month review hearing.


II

DISCUSSION

Mother argues the evidence was insufficient to support the ultimate jurisdictional fact necessary for the 387 petition: that the juvenile court's prior placement order vesting joint physical custody of F.L. with Mother was ineffective in protecting the child. (*In re Jonique W.* (1994) 26 Cal.App.4th 685, 691.) She asserts: "[T]here [wa]s no evidence [she] was a substance abuser, nor was there any evidence that [she] used drugs while F.L. was in her [] care, [and, alternatively,] even if she did," there was an insufficient evidentiary nexus showing that using illicit drugs "placed F.L. at risk of harm." We review the record for substantial evidence and conclude none of Mother's contentions provide a basis to reverse the court's 387 petition ruling.


*A. Standard of Review and Section 387 Principles*

A 387 petition can authorize a change to a dependent child's placement with a parent to a more restrictive placement. (See *In re Brianna S.* (2021) 60 Cal.App.5th 303; Cal. Rules of Court (CRC), rule 5.560(c).) Through a bifurcated hearing, the court must first implement the same procedures as a jurisdictional hearing and determine: (1) whether the factual allegations of the 387 petition are true; and (2) whether the court's previous dispositional ruling for the child was ineffective. (CRC, rule 5.565(e)(1).) If the court sustains both points by a preponderance of the evidence, it

9

must also make dispositional findings according to the same procedural rules that apply to disposition hearings (CRC, rule 5.565(e)(2) [referencing CRC, rule 5.695]), under a clear and convincing evidentiary standard (CRC, rule 5.695(c) [referencing § 361]).

One ground for removal is finding "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

We review both the juvenile court's supplemental jurisdictional and dispositional findings for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 (*O.B.*); [clear and convincing evidentiary standard "falls between the 'more likely than not' standard commonly referred to as a preponderance of the evidence and the more rigorous standard of proof beyond a reasonable doubt"] *id* at p. 995.) For both categories of findings, Mother has the burden to show no substantial evidence supporting them. (*In re T.W., supra*, 214 Cal.App.4th at p.1162.)

Mother's arguments for reversal provide no basis to overturn the juvenile court's 387 petition ruling because her interpretation of the evidence that was before the court relies on a view favorable to her and not SSA, which prevailed on the petition. (*O.B., supra*, 9 Cal.5th at pp. 1011-1012.) Substantial evidence supports the court's

10

findings of a "fairly well-documented substance abuse history," sufficient danger arising from Mother's ongoing struggle, and no reasonable alternative means of protecting F.L. other than removal as the dependency case proceeded.

"The focus of the [the dispositional removal] statute is on averting harm to the child." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child" (*In re Chantal S.* (1996) 13 Cal.4th 196, 201), including assessing past conduct when appropriate (*In re Cole C., supra*, 174 Cal.App.4th at p. 917). "'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .'" (*In re I.J.* (2013) 56 Cal.4th 766, 778, quoting *People v. Hall* (Colo.2000) 999 P.2d 207, 217-218.) In California, the gravity of the relationship between the potential negative effects of substance abuse and harm to children is explicit. (§ 300.2 ["[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child"]. However, the statutory language does not mean that drug use, or abuse, standing alone, is a sufficient basis for action. (See *In re L.W.* (2019) 32 Cal.App.5th 840, 849 ["On the other hand, our case law stands for the proposition that drug use or substance abuse, without more, is an insufficient ground to assert jurisdiction in dependency proceedings under section 300"].)

In this case, SSA's primary report for the 387 petition hearing included the communication by Mother's treating physician assistant, discussed above, that Mother had been diagnosed with polysubstance dependency. The report also presented the juvenile court with information that Mother was denying drug use to both the physician assistant and SSA, at the same time that repeated patch tests demonstrated that she was

11

not sober. This was sufficient evidence from which the court could draw a conclusion that Mother was struggling with a substance abuse issue.

Viewing the record in the light most favorable to SSA, substantial evidence also supports the requisite nexus between Mother's substance abuse struggle and substantial danger to her daughter, F.L. As noted, section 361, subdivision (c)(1), requires present *or future* danger to a dependent child to justify removal of parental custody and a low probability of danger by itself does not necessarily negate justification for removal where the magnitude of the danger is great. (See *In re I.J., supra*, 56 Cal.4th at p. 778.) Denial about a source of danger can increase both the probability of harm the child could suffer (see, e.g., *In re S.R.* (2020) 48 Cal.App.5th 204, 223; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197) as well as the magnitude of its effects (see, e.g., *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763-764). Here, Mother's categorical denial of substance use amplified the danger F.L. faced, given the totality of the circumstances before the juvenile court, including the child's tender age of four at the time of the 387 petition hearing. (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219-1220 [for a child of "tender years," younger than seven, a parent's substance abuse issue provides prima facie evidence of substantial risk of harm to the child].) The court reasonably could conclude Mother's inability to confront substance abuse, even though it could mean losing custody of her child, posed a substantial danger to F.L. Mother has not carried her burden to show we must conclude otherwise. (*In re T.W., supra*, 214 Cal.App.4th at p.1162.)

None of Mother's discussed case law persuades us there was insufficient evidence in this case. She most heavily relies on *In re L.C.* (2019) 38 Cal.App.5th 646 (*L.C.*). Contrary to her assertion that the facts here are similar, *L.C.* instead aptly underscores the fundamental contrast between denial and acknowledgement of substance use. In *L.C.*, a child protection agency filed a juvenile dependency petition asserting the legal guardian of a six-year-old child abused amphetamine and methamphetamine. (*Id.* at

p. 648.) The guardian lied to a social worker about drug use, missed a drug test, and twice tested positive for using methamphetamine. (*Id.* at pp. 648-650.) "[T]he juvenile court sustained [jurisdictional] allegations that [the guardian] abused [drugs] . . . render[ing] him unable to provide regular care for [the child] and plac[ing] her at risk of serious physical harm." (*Id.* at p. 651.)

In reversing for insufficient evidence, the appellate court in *L.C.* held that "evidence of a legal guardian's occasional methamphetamine use outside the legal guardian's home and while the child was in the care of another adult in the home does not support dependency jurisdiction . . . . No substantial evidence showed that the legal guardian abused methamphetamine [nor that] the child was at risk of serious physical harm." (*L.C.*, supra, 38 Cal.App.5th at p. 648.)

Importantly, the appellate court noted that "[a]t the [underlying] hearing [for that appeal], [the guardian] acknowledged that he tested positive twice for methamphetamine and that he lied to the social worker when he denied using methamphetamine. [The guardian] testified that he lied because he did not want the social worker to remove [the child] from his custody. [The guardian] testified that he took methamphetamine when he was at a party at a hotel. [The guardian] took methamphetamine in December 2017 and February, August, and September 2018. His only method of using methamphetamine was smoking it. During cross-examination, [the guardian] testified that he used methamphetamine at most six or seven times, and [the child protection agency] did not contest this number." (*L.C.*, supra, 38 Cal.App.5th at p. 650.)

The *L.C.* court returned to the factual points above when it rejected the respondent child protection agency's argument for an affirmance. It stated that, "[a]lthough respondent correctly points out that [the guardian] initially lied about his use of methamphetamine, he modified his conduct when he realized that he could lose [the child]. [The guardian] stopped using methamphetamine, arranged for his own drug tests

13

to show that he had stopped using, enrolled in a class concerning controlled substances, and acknowledged his use of methamphetamine at the jurisdictional hearing." (*L.C., supra*, 38 Cal.App.5th at p. 653.)

Despite Mother's view of the case, *L.C.'s* contrast in the level of acknowledging methamphetamine use supports a conclusion here that it was reasonable for the juvenile court to infer that Mother was not confronting her substance abuse. (*O.B., supra*, 9 Cal.5th at pp. 1011-1012.) The substantial evidence standard of review does not allow us to reach undisputed factual points that were material to the appeal in *L.C.* For example, there the guardian's acknowledgement of drug use allowed the appellate court to rely on his undisputed representations that he only used drugs while away from the child's home as the child was being cared for by another adult. (*L.C., supra*, 38 Cal.App.5th at p. 648.) In contrast, given Mother's categorical denial of her otherwise unimpeached positive drug patch results, the substantial evidence contradicting her denial requires us to presume against Mother's position that "there was no evidence that Mother had ingested drugs during the time F.L. was in her care." In other words, *L.C.* does not support a conclusion the court in this case made its findings based on insufficient evidence.

Mother correctly notes that the *L.C.* court stated substance abuse "is shown by a diagnosis from a medical professional or by evidence of criteria recognized by the medical profession as indicative of a substance abuse disorder." (*L.C., supra*, 38 Cal.App.5th at p. 652.) While either a medical diagnosis, like the polysubstance diagnosis Mother's physician assistant communicated in this case, or evidence establishing clinical substance abuse is relevant information in determining abuse, neither is necessarily required to establish a finding of substance abuse, at least where the parent categorically denies using illicit drugs despite repeated and scientifically unimpeached positive test results. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 601 [rejecting argument that court must use clinical definitions of substance abuse to distinguish use from abuse];

14

*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 725 [medical diagnosis parent has substance abuse problem is not a required element of proof to find substance abuse under jurisdictional statute]; *In re Christopher R., supra*, 225 Cal.App.4th at p. 1218 [clinical definition of substance abuse "is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court"; evidence may show parent is a current substance abuser even if parent's conduct "fell outside" clinical definitions].)

Given the above, substantial evidence supports the determination that the allegations of the 387 petition were true, that the court's earlier dispositional ruling for the child was ineffective, and that there were no reasonable alternative means of protecting F.L. other than removal from Mother's custody. None of Mother's evidentiary challenges provide a ground to reverse the court's 387 petition ruling under the substantial evidence standard of review. Although it is not disputed Mother loves her daughter, showed that love during visits, and put forth effort in programs, these points do not override the substantial evidence supporting the juvenile court's substance abuse findings on the 387 petition that justified the removal of F.L. from Mother's physical custody while Mother continued to participate in SSA-offered programs.

## III

### DISPOSITION

The juvenile court's September 16, 2021 order is affirmed.


ZELON, J.*

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.