The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 4, 2026

**2026 COA 44**

**No. 24CA1002, *People v. Cooper* — Criminal Law — Commencement of Criminal Action — Judge May Require Prosecution — Special Prosecutor; Government — Department of Law — Powers and Duties of the Attorney General**

A division of the court of appeals holds that the special prosecutor statute, section 16-5-209, C.R.S. 2025, is not the exclusive means for prosecuting an individual when the elected district attorney has declined to prosecute. The Attorney General may also prosecute an individual pursuant to an executive order issued by the Governor under section 24-31-101(1), C.R.S. 2025, consistent with the Colorado Constitution.

The division also holds that, under section 18-3-105, C.R.S. 2025, which defines the offense of criminally negligent homicide, and under section 18-1-501(3), C.R.S. 2025, which defines criminal negligence, the standard of care applicable to the defendant's

conduct is that of a reasonable person in the actor's situation under all the circumstances known to the actor.  That standard must — in a case like this — be one that would apply to an emergency medical professional treating a person in the patient's condition.

COLORADO COURT OF APPEALS          **2026 COA 44**

Court of Appeals No. 24CA1002
Adams County District Court No. 21CR2800
Honorable Mark Warner, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jeremy Cooper,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE J. JONES
Meirink and Berger*, JJ., concur

Announced June 4, 2026

Philip J. Weiser, Attorney General, Erin K. Grundy, First Assistant Attorney General, Gabriel P. Olivares, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Alonzi Pellow Beggan LLC, Mike K. Pellow, Shana R. Beggan, Denver Colorado; Wheeler Trigg O'Donnell LLP, Frederick R. Yarger, Denver, Colorado, for Defendant-Appellant

Lewis Roca Rothgerber Christie LLP, Kendra N. Beckwith, Nathan B. Thoreson, Denver, Colorado, for Amici Curiae American College of Emergency Physicians, Emergency Nurses Association, and the Colorado Chapter of the American College of Emergency Physicians

The Kelman Buescher Firm, Niaomi Perera, Denver, Colorado, for Amicus Curiae International Association of Fire Fighters

Philip J. Weiser, Attorney General, Kurtis T. Morrison, Deputy Attorney General, Joseph G. Michaels, Assistant Solicitor General, Lane Towery, Assistant Attorney General, Denver, Colorado, for Amicus Curiae Jared S. Polis, Governor of the State of Colorado

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     This case arises out of the tragic death of Elijah McClain following an interaction with Aurora police officers and fire rescue paramedics.  Defendant, Jeremy Cooper, is the paramedic who injected Mr. McClain with ketamine, which, the People contend, contributed to his death.  Cooper appeals the district court's judgment of conviction entered on a jury's verdict finding him guilty of criminally negligent homicide.  We conclude that the district court erred by failing to properly instruct the jury on the standard of care applicable to the criminally negligent homicide charge and that the error wasn't harmless.  Accordingly, we reverse the judgment and remand the case for a new trial.

## I.     Background

¶ 2     One summer evening, Mr. McClain walked to a convenience store and bought a few cans of iced tea.  The store's security cameras showed him wearing a black ski mask and headphones, paying for his tea, and dancing with his arms raised in the parking lot.

¶ 3     Soon after Mr. McClain left the store, a 911 caller reported a "sketchy" looking black male "walking fast" down the street wearing a black ski mask and "moving his arms."

¶ 4    Aurora police officers saw Mr. McClain. Police body-worn cameras recorded the interaction. When the officers asked Mr. McClain to stop, he said he had a right to walk where he was going and continued walking. Three officers then tried to physically restrain Mr. McClain. One repeatedly told him to "stop tensing up," and one told him to "relax or I'm going to have to change this situation." Mr. McClain objected to being stopped, and the officers began to struggle with him.

¶ 5    As the officers continued to struggle with Mr. McClain, one of them said, "He just grabbed your gun," to one of the other officers. The officers pushed Mr. McClain to the ground. An officer tried to put Mr. McClain in a carotid control hold, whereby a person applies pressure on someone's neck with his bicep and forearm. When that effort failed, another officer put Mr. McClain in a carotid control hold. The second hold cut off blood flow to Mr. McClain's brain, causing him to temporarily lose consciousness. When Mr. McClain regained consciousness, he told the officers that he couldn't breathe. He later vomited. An officer asked a dispatcher to send paramedics to treat Mr. McClain because he had temporarily lost consciousness.

¶ 6      Cooper; his supervisor, Lieutenant Peter Cichuniec; and two nonmedical fire department personnel (an "engineer" and a firefighter) arrived a few minutes later.  They saw two officers restraining Mr. McClain on the ground.  The police officers told Cooper and Cichuniec that Mr. McClain had "passed out," was "definitely on something," and was "acting crazy."  One of the officers said that the officers had tried to "put a carotid on the guy" and had done so, which "put [Mr. McClain] out."  Officers also said Mr. McClain had shown "incredible" and "crazy" strength from "whatever he's on" and "almost did a pushup with all three of us on his back."

¶ 7      Based on the information the officers had told them and their visual assessment of Mr. McClain, Cooper and Cichuniec concluded that Mr. McClain showed symptoms of a condition called "excited

3

delirium."[1]  They agreed they would inject Mr. McClain with ketamine.[2]  Cooper told the officers that the paramedics would inject Mr. McClain with ketamine once the ambulance arrived with the drug.  (An ambulance with two emergency medical technicians (EMTs) had also been dispatched to the scene.)

¶ 8    Once the ambulance arrived, Cooper and Cichuniec determined that 500 mg of ketamine was the correct dosage to give to Mr. McClain based on his weight (which Cooper estimated at about 220 pounds (100 kg) and Cichuniec estimated at 187 pounds

---

[1] "Excited (or agitated) delirium is characterized by agitation, aggression, acute distress and sudden death, often in the pre-hospital care setting.  It is typically associated with the use of drugs that alter dopamine processing, hyperthermia, and, most notably, sometimes with death of the affected person in the custody of law enforcement."  Asia Takeuchi, Terence L. Ahern & Sean O. Henderson, *Excited Delirium*, 12 W. J. of Emergency Med. 77, 77 (Feb. 2011), https://perma.cc/95WN-ZRUX.  Since the events in this case, several organizations, including the American Medical Association, the American Psychiatric Association, and the American Academy of Emergency Medicine, have rejected excited delirium as a legitimate medical diagnosis.  As discussed below, however, the applicable standard of care is determined as of the time of the actor's conduct.

[2] Ketamine is "a rapid-acting general anesthetic."  Mani Yavi et al., *Ketamine Treatment for Depression: A Review*, 2 Discover Mental Health, art. 9 (Apr. 15, 2022), https://perma.cc/3V4B-88CL.

(85 kg)) and his degree of agitation.[3]  (In fact, Mr. McClain weighed only 143 pounds.)  Either Cooper or Cichuniec told an EMT to prepare it.  Once the EMT did so, Cooper injected it into Mr. McClain.

¶ 9    Sometime after Mr. McClain was placed in the ambulance, Cichuniec noticed that he had stopped breathing.  He told an EMT to check Mr. McClain's pulse.  When the EMT couldn't find one, the EMTs began CPR.  Mr. McClain was subsequently admitted to a hospital.  Doctors declared him brain dead a few days later.

¶ 10    A doctor with the Adams County Coroner's Office investigated the cause of death and classified it as "undetermined" as to both cause and manner.  As explained in more detail below, the District Attorney for the Seventeenth Judicial District subsequently declined to prosecute Cooper and Cichuniec (or any of the police officers).  But Governor Jared Polis later issued an executive order directing the Attorney General to investigate and, if necessary, prosecute on the State's behalf, invoking his authority under section 24-31-

---

[3] Cooper and Cichuniec testified that the dosage for ketamine is 5 mg per kg of body weight, but that the dosage may be adjusted upward if the patient is particularly "agitated."  The propriety of such an adjustment was disputed at trial.

5

101(1)(a), (b), C.R.S. 2025. Colo. Exec. Order No. D 2020 115 (June 25, 2020).

¶ 11    At the Attorney General's request, a forensic pathologist reviewed Mr. McClain's autopsy records and tissue samples, other experts' reports, videos of the encounter, and witness statements. He concluded that Mr. McClain had died from "[c]omplications following acute ketamine administration during violent subdual and restraint by law enforcement and emergency response personnel."

¶ 12    A state grand jury subsequently indicted Cooper and Cichuniec on one count each of reckless manslaughter and criminally negligent homicide and three counts each of second degree assault.[4]  They were tried together.  The prosecution's theory was that Cooper and Cichuniec had acted contrary to their medical training and proper protocols.  And the prosecution charged that

---

[4] The second degree assault charges were for causing serious bodily injury by means of a deadly weapon (ketamine), intentionally causing psychological or mental impairment or injury by administering a drug without the victim's consent and without a medical purpose, and causing serious bodily injury with the intent to cause bodily injury.  *See* § 18-3-203(1)(d), (e), (g), C.R.S. 2025. The deadly weapon charges weren't submitted to the jury.

each could be found guilty of all the charges as either a principal or a complicitor.

¶ 13 A jury found Cooper guilty of criminally negligent homicide but acquitted him of all other charges. The same jury found Cichuniec guilty of criminally negligent homicide and one count of second degree assault (unlawful administration of drugs) but acquitted him of reckless manslaughter and the remaining count of second degree assault (causing serious bodily injury with intent to cause bodily injury). Cooper and Cichuniec separately appealed their convictions. This appeal is Cooper's.

## II.   Discussion

¶ 14 Cooper contends that the district court erred by (1) denying his motion to dismiss the indictment because the Attorney General didn't have any authority to prosecute the case; (2) failing to properly instruct the jury on the standard of care for criminal negligence; (3) refusing to instruct the jury that use of reasonable and appropriate physical force to treat Mr. McClain was an affirmative defense that the prosecution was required to disprove beyond a reasonable doubt under section 18-1-703(1)(e)(II), C.R.S.

7

2025, of the special relationships statute; and (4) allowing jurors access to extraneous prejudicial information.

¶ 15    We first address Cooper's challenge to the Attorney General's authority to prosecute the case because if he is correct, the indictment must be dismissed. We hold that the Attorney General has such authority. But we also hold that the district court erred by inaccurately instructing the jury on the standard of care for criminal negligence under the circumstances in this case and, relatedly, by failing to adequately explain the standard of care to the jurors after they asked for a definition or description of the standard. And because we also hold that these errors weren't

harmless, we reverse the judgment and remand the case for a new trial.[5]

A. The Attorney General's Authority to Prosecute

¶ 16    Cooper contends that the district attorney's "affirmative decision" not to prosecute him means that the Attorney General can't prosecute him because the only way the district attorney's decision could be overridden was under Colorado's special prosecutor statute. We aren't persuaded.

---

[5] Because we reverse the judgment and remand the case for a new trial, we only address two of Cooper's other contentions. We address his contention that the Attorney General didn't have legal authority to prosecute the case because if he is right, the indictment must be dismissed. We address his contention that the court erred by refusing to instruct the jury that the special relationship is an affirmative defense because it is likely to arise in the event of a retrial. *Herrera v. Lerma*, 2018 COA 141, ¶¶ 11-12; *People v. Snelling*, 2022 COA 116M, ¶ 64 (Gomez, J., specially concurring) ("When divisions of this court decide an issue that requires a reversal and remand, we typically reach additional issues only to the extent that they are likely to arise again on remand."); *People v. Stewart*, 2017 COA 99, ¶ 64 (J. Jones, J., concurring in part and dissenting in part) ("[O]ur common practice is to address contentions that pertain to issues likely to arise on remand."). We won't address his contention about jury exposure to extraneous prejudicial information because it isn't likely to arise in the event of a new trial.

9

## 1. Additional Background

¶ 17    In the autumn of 2019, a few months after Mr. McClain's death, Dave Young, the District Attorney for the Seventeenth Judicial District, sent a letter to Aurora's Chief of Police explaining that the coroner's report and the results of his office's investigation didn't support prosecuting anyone in connection with Mr. McClain's death.[6]

¶ 18    But in the summer of 2020, Governor Polis issued Executive Order D 2020 115, ordering the Attorney General "to investigate and, if the facts support prosecution, criminally prosecute any individuals whose actions caused the death of Elijah McClain."[7] The Attorney General empaneled a grand jury. The grand jury returned a thirty-two-count indictment against Cooper, Cichuniec, and three police officers.

---

[6] The letter isn't in the record on appeal, but Cooper and the People acknowledged the letter in motions below and in their opening and answer briefs on appeal. The parties don't appear to dispute the existence and content of the letter.

[7] The Governor subsequently issued two related executive orders — D 2020 246 (Nov. 10, 2020) and D 2020 267 (Dec. 2, 2020) — amending the first order to further define the "breadth and scope of the Attorney General's authority to investigate and prosecute offenses arising from" this matter.

¶ 19    Before trial, Cooper's counsel filed a motion to dismiss the charges for a lack of jurisdiction.  (Cichuniec's counsel filed a similar motion.)  Counsel argued, as now relevant, that the Governor and Attorney General had unlawfully circumvented Colorado's special prosecutor statute, section 16-5-209, C.R.S. 2025, which provides as follows:

> The judge of a court having jurisdiction of the alleged offense, upon affidavit filed with the judge alleging the commission of a crime and the unjustified refusal of the prosecuting attorney to prosecute any person for the crime, may require the prosecuting attorney to appear before the judge and explain the refusal.  If after that proceeding, based on the competent evidence in the affidavit, the explanation of the prosecuting attorney, and any argument of the parties, the judge finds that the refusal of the prosecuting attorney to prosecute was arbitrary or capricious and without reasonable excuse, the judge may order the prosecuting attorney to file an information and prosecute the case or may appoint a special prosecutor to do so.

¶ 20    At a hearing on the motion, the Solicitor General argued that section 16-5-209 didn't apply because "[t]he Attorney General is here prosecuting this case under the authority of [section] 24-31-101."  Subsection (1)(b) of that section provides that the Attorney General "[s]hall appear for the state and prosecute and defend all

11

actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor." § 24-31-101(1)(b).[8]

¶ 21 The district court denied defense counsel's motion, concluding that section 16-5-209 and section 24-31-101(1)(b) "provide two ways of going about things when the district attorney decline[s] to prosecute" and "one doesn't necessarily trump the other."

### 2. Applicable Principles of Statutory and Constitutional Interpretation and Standard of Review

¶ 22 Cooper's arguments implicate the meanings and relationships of certain statutes and one provision of the Colorado Constitution. When we interpret a statute, we ultimately must determine and effectuate the General Assembly's intent. *People v. Manzo*, 144 P.3d 551, 554 (Colo. 2006). "We first consider the statute's language, 'assigning its words and phrases their plain and ordinary meanings.'" *Johnson v. People*, 2023 CO 7, ¶ 15 (quoting *McBride v. People*, 2022 CO 30, ¶ 23). We do so, however, by reading the

---

[8] As noted, the Governor also invoked section 24-31-101(1)(a), C.R.S. 2025, which says, in relevant part, that the Attorney General "[s]hall act as the chief legal representative of the state." The Attorney General doesn't argue that subsection (1)(a) of section 24-31-101 independently gives him authority to prosecute this case.

language in context and in light of the entire statutory scheme. *McCoy v. People*, 2019 CO 44, ¶¶ 37-38.  And "[w]e must adopt a construction that avoids or resolves potential conflicts, giving effect to all legislative acts, if possible."  *People v. Stellabotte*, 2018 CO 66, ¶ 32 (quoting *Huber v. Colo. Mining Ass'n*, 264 P.3d 884, 892 (Colo. 2011)).

¶ 23    "In giving effect to a constitutional provision, we employ the same set of construction rules applicable to statutes . . . ."  *Danielson v. Dennis*, 139 P.3d 688, 691 (Colo. 2006).  "[O]ur goal is to prevent the evasion of the constitution's legitimate operation and to effectuate the intent of the framers of our constitution and of the people of this state."  *People v. Smith*, 2023 CO 40, ¶ 20.

¶ 24    We review de novo questions of statutory and constitutional interpretation.  *Gessler v. Colo. Common Cause*, 2014 CO 44, ¶ 7; *People v. Salgado*, 2019 COA 5, ¶ 10.

### 3.    Analysis

¶ 25    Article VI, section 13 of the Colorado Constitution provides that the district attorney of a judicial district "shall . . . perform such duties *as provided by law*."  (Emphasis added.)  Acting pursuant to that provision, the General Assembly has vested each

13

district attorney with the authority to "appear in behalf of the state . . . [i]n all indictments, actions, and proceedings which may be pending in the district court in any county within his district wherein the state or the people thereof . . . may be a party." § 20-1-102(1)(a), C.R.S. 2025; *see People v. Gibson*, 125 P. 531, 535 (Colo. 1912).

¶ 26  Recognizing the sweep of article VI, section 13 and section 20-1-102, the Colorado Supreme Court has held that "[t]he Colorado Constitution and the statutory commands of the general assembly grant the *bulk* of prosecutorial powers and duties to the district attorneys of the several judicial districts," *People ex rel. Tooley v. Dist. Ct.*, 549 P.2d 774, 777 (Colo. 1976) (emphasis added), including the power "to determine who shall be prosecuted and what crimes shall be charged," *People v. Dist. Ct.*, 632 P.2d 1022, 1024 (Colo. 1981).

¶ 27  But this authority is neither unlimited nor exclusive. *See People ex rel. Losavio v. Gentry*, 606 P.2d 57, 62 (Colo. 1980) ("*Except as otherwise provided for by statute*, the district attorney is the sole authority charged with performing these duties and he may not be supplanted in his duties by any other authority." (emphasis

14

added)). As relevant to this case, the General Assembly has enacted two provisions granting prosecutorial authority to persons other than the elected district attorney.

¶ 28 The first is section 24-31-101(1)(b), which says that "[t]he attorney general . . . [s]hall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor." (The General Assembly enacted this statute pursuant to article IV, section 1 of the Colorado Constitution, which says that the Attorney General "shall perform such duties as are prescribed by this constitution or by law.")

¶ 29 The second is section 16-5-209, which says that when a person files an affidavit with the court "alleging the commission of a crime and the unjustified refusal of the prosecuting attorney to prosecute," following an evidentiary hearing at which the prosecutor may be required to explain the refusal, the court may order the prosecuting attorney to prosecute the offense or may appoint a special prosecutor to do so if the court determines that the

prosecutor's refusal is "arbitrary or capricious and without reasonable excuse."[9]

¶ 30     Cooper acknowledges that the Colorado Supreme Court has held that section 24-31-101(1)(b) doesn't conflict with district attorneys' constitutional and statutory authority to prosecute criminal cases.  *See, e.g., People ex rel. Witcher v. Dist. Ct.*, 549 P.2d 778, 779-80 (Colo. 1976); *Gibson*, 125 P. at 533, 536.  But he argues that when, as in this case, the district attorney has expressly declined to prosecute, the only alternative means of bringing a prosecution is via section 16-5-209.  We reject this argument.

¶ 31     Section 24-31-101(1)(b) and section 16-5-209 provide two alternative means of prosecuting a criminal case independent of the district attorney's authority under section 20-1-102 — one subject to the Governor's discretion and the other subject to the court's

_____

[9] The special prosecutor may be a district attorney, assistant district attorney, or deputy district attorney "who serve[s] in [a] judicial district[] other than where the appointment is made," or, on the Chief Justice's written approval, any "disinterested private attorney" licensed to practice law in Colorado.  § 16-5-209, C.R.S. 2025.

discretion (upon affidavit by an aggrieved party).[10]  There is no language in either statute saying expressly or implying that section 24-31-101(1)(b) can't be invoked by the Governor when a district attorney expressly declines to prosecute.  In essence, Cooper asks us to read into one or both statutes limiting language restricting the Governor's authority in situations such as this.  That we cannot do. *People v. Atencio*, 219 P.3d 1080, 1082 (Colo. App. 2009); *People v. Sorrendino*, 37 P.3d 501, 504 (Colo. App. 2001) ("[A] court should not read into a statute an exception, limitation, or qualifier that its plain language does not suggest, warrant, or mandate.").[11]

¶ 32    Our conclusion doesn't, as Cooper asserts, ignore "the constitutionally mandated roles of Colorado's district attorneys."  As

---

[10] Section 16-5-209 doesn't say who may ask the court to appoint a special prosecutor.  We don't express any opinion on who may do so.

[11] Citing section 24-31-101(1)(e) and (i), Cooper asserts that "[w]hen the General Assembly wishes to supplant the district attorneys' authority in particular areas, it does so expressly."  But that is precisely what the General Assembly did by enacting section 24-31-101(1)(b). *People ex rel. Witcher v. Dist. Ct.*, 549 P.2d 778, 779-80 (Colo. 1976) (when the statutory conditions of section 24-31-101(1) are met, "the attorney general has the right to assume the prosecutorial responsibilities and duties"; holding that the district attorney had to yield to the Attorney General in prosecuting a state grand jury indictment following the Governor's executive order).

noted above, under article VI, section 13, district attorneys' duties are those "as provided by law" — that is, as provided by the General Assembly. So, too, are the Attorney General's, at least in part. Colo. Const. art. IV, § 1 (also providing that the Attorney General has duties "as are prescribed by this constitution or by law"). The General Assembly has enacted complementary and partially overlapping statutes addressing the prosecution of criminal cases pursuant to these constitutional provisions. The upshot is that while elected district attorneys have "the bulk of prosecutorial powers and duties," *People ex rel. Tooley*, 549 P.2d at 777, in certain situations specified by statute, they don't necessarily have the final word.

¶ 33    We therefore conclude that the district court didn't err by denying Cooper's motion to dismiss the indictment.

### B.    Standard of Care Jury Instruction

¶ 34    Cooper contends that the district court erred by refusing his counsel's tendered instruction specifying the standard of care applicable to the charge of criminally negligent homicide and by refusing to adequately and accurately define that standard after the jurors affirmatively indicated that they didn't understand what

standard to apply.  We agree with Cooper.  We also conclude that the errors weren't harmless.

### 1.    Additional Background

¶ 35    In opening statement, the prosecutor asserted that Cooper "failed to give his medical patient Mr. McClain adequate medical treatment" and that Cooper violated "every single step of the training and protocols that [he was] supposed to follow."  During the prosecution's case-in-chief, several doctors and other medically trained witnesses testified about what Cooper — as a medical professional — should and should not have done when providing medical treatment to Mr. McClain.  In closing argument, the prosecutor argued that Cooper had failed to follow his training and applicable protocols in making "medical decision[s]" and tied these failures to the elements of the charged crimes.  In rebuttal closing argument, the prosecutor led with the following: "These defendants treated Elijah McClain like he was a problem, not like he was their patient."  The prosecutor followed up by recounting the ways in which Cooper had deviated from his medical training and applicable protocols, repeatedly referring to the testimony of various medical professionals.

19

¶ 36     In short, the prosecution's case was premised not on what an ordinary person off the street should or should not have done, but on what a person with Cooper's training and experience as a paramedic should or should not have done.

¶ 37     Before closing arguments, based on the prosecution's theory of culpability, Cooper's counsel tendered a jury instruction that read, "A person acts 'with criminal negligence' when, through a gross deviation from the standard of care that a *reasonable paramedic in Aurora, Colorado* would exercise in the same circumstance, he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists."  (Emphasis added.)  Counsel argued that the circumstances in this case presented a unique blend of a criminal law and medical malpractice law and that "[t]he conduct of medical providers is measured against the reasonable medical provider in the same field of practice or similar."

¶ 38     The prosecutor objected to the defense's tendered instruction. She argued that the instruction should not deviate from the language employed in the definition of "criminal negligence" in section 18-1-501(3), C.R.S. 2025, or the Colorado pattern jury instruction that tracks the definition.  She also argued, citing

*People v. Luna*, 2020 COA 123M, that a "reasonable person" for purposes of criminal negligence isn't defined in terms of a person's particular characteristics. The pattern instruction tendered by the prosecution read, "A person acts 'with criminal negligence' when, through a gross deviation from the standard of care that *a reasonable person* would exercise, he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists." *See* COLJI-Crim. F:79 (2025) (emphasis added).

¶ 39 The court rejected the defense's tendered instruction, reasoning that even though, "from time to time, the General Assembly looks to civil law for certain terminology," the General Assembly hadn't done so in section 18-1-501(3). The district court said it was "going to follow what the General Assembly has told me I'm supposed to do." The court instructed the jury on the definition of criminal negligence using Colorado's pattern instruction, without modification.

¶ 40 After the jurors began deliberating, the court received the following question from the jurors: "May we have a definition of the standard of care? Or a description of it?" Cooper's counsel reiterated the defense's position that "the professional standard of

care . . . in this case . . . would be reasonable paramedics in Aurora, Colorado." The prosecutor asked the court to just refer the jury back to the instructions as given. The court said it would do as the prosecutor requested and indicated what the response would say. Cooper's attorney then objected to the response's inclusion of the language "words should be given their common and ordinary meanings." The prosecutor argued for retaining that language.

¶ 41 The court, again agreeing with the prosecutor, replied to the jury as follows: "Generally, undefined words and phrases may be given their common and ordinary meanings. The Court may only refer the jury back to the prior instructions as a whole. The Court may not provide further definition of the terms."

### 2. Standard of Review

¶ 42 "The United States and Colorado Constitutions guarantee the defendant in a criminal case both the right to have a jury decide his case and the right to have the prosecutor prove to that jury, beyond a reasonable doubt, every element of the charged offense." *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001). "To preserve these guarantees, we require that the trial court properly instruct the jury on every element of a crime." *Id.*

¶ 43    "We apply a two-tier standard of review to jury instructions." *People v. Neckel*, 2019 COA 69, ¶ 26. "First, we review de novo the jury instructions as a whole to determine whether the instructions accurately informed the jury of the governing law." *People v. Stellabotte*, 2016 COA 106, ¶ 18, *aff'd*, 2018 CO 66. "Second, if the trial court correctly informed the jury of the governing law, we review the court's formulation of the instructions for an abuse of discretion." *Id.* "Therefore, we review a trial court's decision to give a particular jury instruction for an abuse of discretion." *McDonald v. People*, 2021 CO 64, ¶ 54 (quoting *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011)). Likewise, we review a court's response to a jury's question for an abuse of discretion. *People v. Cox*, 2023 COA 1, ¶ 16. A court abuses its discretion in this context only when its ruling is manifestly arbitrary, unreasonable, or unfair, or based on a misunderstanding or misapplication of the law. *People v. Trujillo*, 2025 COA 22, ¶ 24 (*cert. granted* Jan. 12, 2026).

¶ 44    The instruction and response at issue concern the elements of the offense. Any error in failing to adequately instruct the jury on the elements of the offense is therefore one of constitutional dimension. *Garcia v. People*, 2022 CO 6, ¶¶ 15-18; *Griego*, 19 P.3d

23

at 7. "[W]e review trial errors of constitutional dimension that were preserved by objection for constitutional harmless error." *Hagos v. People*, 2012 CO 63, ¶ 11; *accord Griego*, 19 P.3d at 7.[12] "These errors require reversal unless the reviewing court is 'able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Hagos*, ¶ 11 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). An error is harmless beyond a reasonable doubt only if there is no reasonable possibility that it contributed to the conviction. *Id.* (also holding that the State bears the burden of showing that such an error was harmless beyond a reasonable doubt).

### 3. Analysis

¶ 45    Cooper was convicted of criminally negligent homicide under section 18-3-105, C.R.S. 2025, which provides that "[a]ny person

---

[12] The People contend that, because Cooper's counsel didn't expressly raise a constitutional objection, we should review for ordinary harmless error. We disagree. Counsel clearly preserved the issue by tendering an instruction, objecting to the pattern instruction, and objecting to the court's response to the jury's question. The nature of the alleged error — failing to adequately instruct the jury on an element of the offense — is constitutional; counsel's failure to use the word "constitutional" doesn't change that.

who causes the death of another person by conduct amounting to criminal negligence commits criminally negligent homicide." And, as noted, "[a] person acts with criminal negligence when, through a *gross deviation* from the *standard of care* that a *reasonable person* would exercise, he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists." § 18-1-501(3) (emphasis added). No statutory provision defines "standard of care" or "reasonable person" for purposes of this offense.

¶ 46    The offense of criminally negligent homicide is of relatively recent vintage. (Indeed, the General Assembly didn't create such an offense under Colorado law until 1971. *See* Ch. 121, sec. 1, §§ 40-1-603, 40-3-105, 1971 Colo. Sess. Laws 404, 419.) This recency reflected a historical reluctance to impose criminal liability based on "the ordinary negligence which is sufficient for tort liability." 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.4, at 491 (3d ed. 2018) (hereinafter, LaFave).

> The thought was this: When it comes to compensating an injured person for damages suffered, the one who has negligently injured an innocent victim ought to pay for it; but when the problem is one of whether to impose criminal punishment on the one who caused

the injury, then something extra — beyond ordinary negligence — should be required.

*Id.* at 491-92. That "something extra" could be different things: (1) a higher degree of negligence than ordinary negligence; (2) a consciousness of the risk created by the actor's conduct; or (3) both a higher degree of negligence and a consciousness of the risk. *Id.* at 492.

¶ 47    Colorado's General Assembly chose option one: a "gross deviation" from the standard of care is required (rather than a mere deviation), but consciousness of the risk created isn't. *See* § 18-1-501(3) (the failure to perceive the risk as a result of the gross deviation from the standard of care is enough to support a conviction). The implication of all this is that the standard of care is the same as would apply in a civil action, but the actor's conduct must involve a greater degree of that negligence — that is, it must create a greater risk of harm that the actor fails to perceive. *See* LaFave, § 5.4(a)(1), (a)(2), (b), at 493-502.

¶ 48    The Colorado Supreme Court recognized this in *People v. Hall*, 999 P.2d 207 (Colo. 2000). In that case, the defendant — "a former ski racer trained in skier safety," *id.* at 211 — "flew off a knoll" and

26

collided with a skier below him, *id.* at 212. The downslope skier died from his injuries. *Id.* at 210. The district court dismissed the charge of reckless manslaughter for lack of probable cause. The supreme court reversed as to reckless manslaughter and also considered whether the evidence presented at the preliminary hearing supported a charge of criminally negligent homicide. In addressing that issue, the court began by saying, "[W]e must ask whether Hall's conduct constituted a 'gross deviation' from the standard of care that a reasonable law-abiding person (in this case, a reasonable, law-abiding, *trained ski racer and resort employee*) would have observed in the circumstances." *Id.* at 223 (emphasis added). The court concluded that, "[b]ased on the evidence, a reasonable person could conclude that Hall's conduct was a gross deviation from the standard of care that a reasonable, *experienced ski racer* would have exercised." *Id.* (emphasis added). In getting to that conclusion, the court looked to civil law imposing a statutory duty on skiers to avoid collisions with downslope skiers. It said that this statutory duty established the "minimum standard of care for uphill skiers" and that a violation of that standard "in an extreme fashion . . . may be evidence of conduct that constitutes a

27

'gross deviation' from the standard of care imposed by statute for civil negligence." *Id.*

¶ 49    The Colorado Supreme Court held similarly when considering the elements of criminally negligent homicide in *Mata-Medina v. People*, 71 P.3d 973 (Colo. 2003). Repeatedly citing *Hall* with approval, the court held that in determining whether the defendant failed to perceive a substantial and unjustifiable risk, the jury must "consider the facts and circumstances of the individual case," consider the nature of risk "in relation to the nature and purpose of the actor's conduct," and "[consider] what a reasonable person *with the actor's knowledge and experience* would have been aware of in the particular situation." *Id.* at 978 (emphasis added) (quoting *Hall*, 999 P.2d at 216).[13]

¶ 50    The supreme court's decision in *People v. Mann*, 646 P.2d 352 (Colo. 1982), also makes clear that civil law may inform the elements of a criminal offense. The defendant in that case

---

[13] Although the court in *Mata-Medina v. People*, 71 P.3d 973, 978 (Colo. 2003), was, in applying these principles from *People v. Hall*, 999 P.2d 207 (Colo. 2000), speaking of the actor's failure to perceive a substantial and unjustifiable risk, those principles seem to also logically apply to whether the actor grossly deviated from the standard of care.

challenged his convictions of child abuse and accessory to child abuse on the basis that the court had instructed the jury on the meaning of child abuse based on a civil statute. Negligence was the basis for such liability. The supreme court held that the district court didn't err because the instruction was consistent with the definition of criminal negligence in section 18-1-501. *Id.* at 361-62.

¶ 51  The takeaways from all this are that (1) the civil law may, in an appropriate case, set the baseline standard of care for criminal culpability; and (2) the reasonable person for purposes of the criminal statute is a reasonable person to whom that standard

applies.[14]  This view is consistent with the generally accepted notions that a reasonable person in this context is a reasonable person in the actor's situation and under all the circumstances known to him, and that the actor's failure to perceive the risk must account for the nature and purpose of the actor's conduct.  *See* Model Penal Code & Commentaries § 2.02 cmt. 4, at 240-41 (A.L.I. 1985); *see also* Model Penal Code § 2.02(2)(d), at 21-22 (A.L.I. 1985); *State v. Warden*, 813 P.2d 1146, 1151 (Utah 1991) ("Since the [criminal] negligence occurred in the context of medical

---

[14] *People v. Luna*, 2020 COA 123M, on which the People rely, doesn't suggest a contrary conclusion.  In that case, the division held that, in instructing the jury on self-defense, the court wasn't required to substitute "reasonable child" for "reasonable person." *Id.* at ¶¶ 27-34.  But there was no issue in that case as to the standard of care and therefore no issue as to the particular "reasonable person" in relation to that standard.  True, the standard is an objective one.  But, as discussed, it is one based on the relevant circumstances, including the nature and purpose of the actor's conduct and the situation in which the actor finds himself.  So while subjective characteristics such as the actor's intelligence or temperament (or, in many cases, even age) may not inform the standard, objective, relevant circumstances do.  *See* Model Penal Code & Commentaries § 2.02 cmt. 4, at 240-42 (A.L.I. 1985).  We also observe that the People don't attempt to explain why the source and nature of the standard of care should be different in a criminal case based on negligence than in a civil case based on negligence.  Nor do the People explain precisely how those standards differ under the facts of this case.

treatment, it is necessary to view the circumstances from the viewpoint of a member of the medical profession." So the standard of care for the charge of negligent homicide was that "which physicians using ordinary care exercise in the delivery and care of newborns."); *State v. Clyde*, 2019 UT App 101, ¶ 26 (holding that there was sufficient evidence establishing the standard of care for a nurse charged with negligent homicide — the appropriate medical protocol).

¶ 52     The relevant circumstances in this case were that a medical professional provided medical treatment to a person needing medical attention while under law enforcement's physical restraint. The standard of care was therefore that which would apply in a civil case involving such a situation — one applicable to a reasonable paramedic in Aurora, Colorado, in 2019 treating a person in Mr. McClain's condition. *See Klimkiewicz v. Karnick*, 372 P.2d 736, 739-40 (Colo. 1962) (when the conduct allegedly giving rise to liability is that of a medical professional providing medical services, it is error to instruct the jury to apply an "ordinarily prudent person" standard; the defendant's conduct should be judged against a standard of ordinary skill and care in the defendant's

medical field); *United Blood Servs. v. Quintana*, 827 P.2d 509, 519 (Colo. 1992) (The standard of care "[f]or those practicing a profession involving specialized knowledge or skill" is "to exercise reasonable care in a manner consistent with the knowledge and ability possessed by members of the profession in good standing."); *Jordan v. Bogner*, 844 P.2d 664, 666 (Colo. 1993) ("A nonspecialist physician must act consistently with the standards required of the medical profession in the community where he or she practices.").

¶ 53    Indeed, it wouldn't make any sense to apply an ordinary reasonable person standard in this context. Given the nature and purpose of Cooper's allegedly negligent conduct, how could the jurors evaluate the reasonableness of his conduct if not by reference to Mr. McClain's medical needs and Cooper's medical training? The prosecution in this case seems to have recognized as much in how it prosecuted the case: Its case was based entirely on Mr. McClain's medical condition and Cooper's alleged failure to treat him in accordance with his medical training and applicable medical protocols.

¶ 54     It follows, then, that the district court erred by refusing defense counsel's tendered instruction and by refusing to clarify the standard of care in response to the jurors' question.

¶ 55     We recognize that ordinarily an instruction tracking statutory language is unlikely to mislead the jury on the state of the law, *Galvan v. People*, 2020 CO 82, ¶ 37, and that the pattern instructions, while "not 'a safe harbor that insulates instructional error from reversal,'" are nevertheless to be given respect, *id.* at ¶ 38 (quoting *Garcia v. People*, 2019 CO 64, ¶ 22). But just because such instructions generally are sufficient, that doesn't mean they are always sufficient. "While generally the giving of instructions in the language of the statute is proper, this is not the case when the statute itself . . . may tend to create ambiguities and lead to confusion in the minds of the jurors . . . ." *McDonald*, ¶ 56 (quoting *Leonard v. People*, 369 P.2d 54, 62 (Colo. 1962)); *see also People v. J.V.*, 635 P.2d 892, 894 (Colo. 1981) (statutory language may require further definition if it is "apt to be misunderstood by a jury"); *Bustamonte v. People*, 401 P.2d 597, 600 (Colo. 1965) ("[A] defendant is entitled to supplementary clarification when additional instructions are necessary adequately to inform a jury in a case . . .

and . . . instructions should be geared to the case being tried."); *Trujillo*, ¶¶ 35-36 (holding that an instruction tracking the language of the statute under which the defendant was charged didn't adequately describe the culpable mental state because a layperson wouldn't be able to determine that meaning without additional instructions).

¶ 56 Under the facts of this case, the definitional instruction didn't adequately articulate the applicable standard of care but rather left the jury in the dark.

¶ 57 Also, the jurors' question told the court that they didn't know what standard to apply. By telling the jurors to apply the "common and ordinary meanings" of the words in the instruction, the court failed to shine any light on the issue and in fact misled the jurors as to the applicable standard of care: The proper standard wasn't that of a generic reasonable person but of a person in Cooper's profession under the existing circumstances. *See Leonardo v. People*, 728 P.2d 1252, 1255-56 (Colo. 1986) (when the jury indicates that it doesn't understand an element of the charged offense, the court must clarify the matter concretely and unambiguously and should not merely refer the jury back to the

instruction); *People v. Claycomb*, 2025 COA 36, ¶¶ 50-51, 54-55 (same; the court erred by telling the jurors to "use the common meaning" of the term they indicated they didn't understand).[15]

¶ 58     These errors weren't harmless beyond a reasonable doubt.[16] The case was hotly contested; there were conflicting expert opinions; the jury rejected the other, more serious charges against Cooper; and the jury affirmatively indicated that it didn't know what standard of care to apply.[17]  Nor, contrary to the People's implication, was the evidence of Cooper's guilt overwhelming.

¶ 59     The People argue that the jury necessarily determined that Cooper didn't act as a reasonable paramedic when considering the

---

[15] To be clear, even if the court didn't err in how it originally instructed the jury, it erred by failing to clarify the issue for the jurors once they affirmatively indicated that they didn't know what standard to apply.

[16] We would also conclude that the judgment must be reversed even if we applied the ordinary harmless error standard of reversal.

[17] The People don't argue that any error was harmless because the standard of an ordinary reasonable person is lower than the standard of a reasonable medical professional under the relevant circumstances.  And such an argument would fail.  The standards are not quantitatively different but qualitatively different.  A jury could surmise, and likely would surmise, that an ordinary reasonable person lacking medical training would, because of that lack of training, choose to do nothing.  Because Cooper did something — injected Mr. McClain with ketamine — the jury could believe that Cooper grossly deviated from this standard of care.

"special relationship" traverse (discussed below). That's an overstatement, for two reasons. First, the traverse concerned whether Cooper used "reasonable and appropriate physical force . . . that [Cooper] reasonably believe[d]" to be appropriate. § 18-1-703(1)(e)(II). It didn't concern the standard of care under section 18-1-501(3). Second, and perhaps more importantly, the prosecution didn't have the burden of disproving that traverse beyond a reasonable doubt (as the instruction expressly indicated). The prosecution did have the burden of proving, beyond a reasonable doubt, that Cooper grossly deviated from the *appropriate* standard of care — a reasonable paramedic in Aurora, Colorado, in 2019. The jury didn't decide that the prosecution had met *that* burden — as to which it was never instructed — by apparently concluding that the traverse didn't raise a reasonable doubt about the State's proof of Cooper's mental state. *See People v. Pickering*, 276 P.3d 553, 557 (Colo. 2011) (giving the jury an instruction on a traverse — where a statute creates a traverse rather than an affirmative defense — isn't "constitutionally erroneous" "[s]o long as the trial court properly instructs the jury regarding the elements of the charged crime").

¶ 60     We therefore reverse the judgment of conviction and remand the case for a new trial.[18]

### C.     The "Special Relationship" Jury Instruction

¶ 61     Cooper contends that the district court erred by refusing to instruct the jury that section 18-1-703(1)(e)(II) of Colorado's "special relationships" statute creates an affirmative defense that the prosecution must disprove beyond a reasonable doubt.  *See Pickering*, 276 P.3d at 555.  We hold that this provision creates a traverse to the charge of criminally negligent homicide, not an affirmative defense.

### 1.     Additional Background

¶ 62     Cooper's counsel tendered an affirmative defense jury instruction that would have told the jurors that the prosecution was required to prove beyond a reasonable doubt that Cooper had not "used reasonable and appropriate physical force for the purpose of administering a recognized form of treatment that he reasonably believed to be adapted to promoting the physical or mental health of

---

[18] Of course, the People may not retry Cooper on any charges of which he was acquitted.  *See* U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18; *People v. Leske*, 957 P.2d 1030, 1035 n.5 (Colo. 1998).

the patient." The tendered instruction closely tracked a portion of

Colorado's "special relationships" statute, which, as relevant to this

case, provides that

> [t]he use of physical force upon another person
> that would otherwise constitute an offense is
> justifiable and not criminal . . . [if a] duly
> licensed physician, advanced practice
> registered nurse, or a person acting under his
> or her direction . . . use[s] reasonable and
> appropriate physical force for the purpose of
> administering a recognized form of treatment
> that he or she reasonably believes to be
> adapted to promoting the physical or mental
> health of the patient if . . . [t]he treatment is
> administered in an emergency when the
> physician or advanced practice registered
> nurse reasonably believes that no one
> competent to consent can be consulted and
> that a reasonable person, wishing to safeguard
> the welfare of the patient, would consent.

§ 18-1-703(1)(e)(II).

¶ 63    The prosecutor objected to the proposed instruction, arguing

that, with respect to reckless manslaughter and criminally negligent

homicide, the statute doesn't create an affirmative defense. The

prosecutor conceded that the jury could be instructed on the

concept as a traverse.

¶ 64    The court agreed with the prosecutor and, in addition to

reciting the elements of the defense, instructed the jury that "with

respect to . . . criminally negligent homicide, the prosecution does

not have an additional burden to disprove use of physical force

(special relationship).  You are instructed, though, that a person

does not act recklessly or in a criminally negligent manner if his

conduct is legally justified as set forth above."[19]

> 2. Applicable Law and Standard of Review

> There are, generally speaking, two types of
> defenses to criminal charges: (1) "affirmative"
> defenses that admit the defendant's
> commission of the elements of the charged act,
> but seek to justify, excuse, or mitigate the
> commission of the act; and (2) "traverses" that
> effectively refute the possibility that the
> defendant committed the charged act by
> negating an element of the act.

*Pickering*, 276 P.3d at 555.  "Whether an asserted defense is an

affirmative defense or a traverse dictates the applicable burden of

proof as to the defense's existence or nonexistence."  *Roberts v.*

*People*, 2017 CO 76, ¶ 22.

> [W]hen the evidence presented properly raises
> the issue of an affirmative defense, the
> affirmative defense effectively becomes an
> additional element of the charged offense, and

---

[19] The court did instruct the jury that the special relationship was an affirmative defense to the second degree assault charges — which required proof that Cooper intentionally caused an injury, *see* § 18-3-203 — of which Cooper was ultimately acquitted.

> the trial court must instruct the jury that the prosecution bears the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable.

*Id.* (citing *Pickering*, 276 P.3d at 555).

¶ 65 "We review de novo the question of whether a trial court accurately instructed the jury on the law." *Martinez v. People*, 2024 CO 48, ¶ 10 (quoting *Tibbels v. People*, 2022 CO 1, ¶ 22).

### 3.     Analysis

¶ 66 We agree with the district court that, for the crime of criminally negligent homicide, subsection (1)(e)(II) of the special relationships statute creates a traverse.

¶ 67 "Under the criminally negligent homicide statute (act involving criminal negligence), the jury must determine that the [defendant] failed to perceive an unjustified risk that a *reasonable* person would have perceived in the situation." *People v. Fink*, 574 P.2d 81, 83 (Colo. 1978) (emphasis added), *superseded by statute on other grounds*, Ch. 83, sec. 1, § 18-1-704, 2003 Colo. Sess. Laws 795, *as recognized in, Pickering*, 276 P.3d at 556; *see also* § 18-1-501(9) (defining "[v]oluntary act"). In *Fink*, the supreme court concluded that "[c]riminally negligent homicide is totally inconsistent with the

. . . theory of self-defense" because a defendant asserting self-defense contends that he acted in a reasonable manner, but by proving that the defendant acted with criminal negligence, the prosecution would necessarily prove beyond a reasonable doubt that he didn't act reasonably. 574 P.2d at 83. Therefore, self-defense isn't an affirmative defense to criminally negligent homicide. *Id.*; *see Castillo v. People*, 2018 CO 62, ¶ 38 n.5; *Sanchez v. People*, 820 P.2d 1103, 1109 (Colo. 1991); *Case v. People*, 774 P.2d 866, 869-70 (Colo. 1989).

¶ 68     This reasoning applies to the special relationship defense at issue in this case. That special relationship defense requires that the defendant used "*reasonable and appropriate physical force* for the purpose of administering a recognized form of treatment that he or she *reasonably believe*[*d*] to be adapted to promoting the physical or mental health of the patient." § 18-1-703(1)(e)(II) (emphasis added). So by proving beyond a reasonable doubt the elements of

criminally negligent homicide, the prosecution necessarily disproves that the defendant acted reasonably.[20]

¶ 69 Cooper was well within his rights to assert and present evidence supporting the special relationship defense to disprove that he acted negligently. *See Fink*, 574 P.2d at 83 (a defendant may present evidence that he was acting in self-defense despite not receiving a self-defense affirmative defense instruction). But the district court wasn't required to instruct the jury that the prosecution had the additional burden of disproving the defense beyond a reasonable doubt.

### III. Disposition

¶ 70 The district court's judgment of conviction is reversed. We remand the case for a new trial.

JUDGE MEIRINK and JUDGE BERGER concur.

---

[20] In this case, as previously discussed, the court didn't properly instruct the jurors on the standard of care, an element of the offense. So the People didn't necessarily disprove the traverse in this case. But on remand, if the People retry Cooper on the criminally negligent homicide charge, so long as the court properly instructs the jurors on the elements, the court should not instruct the jurors that the special relationship is an affirmative defense.